# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

THE FREDERICK HSU LIVING TRUST,

      Plaintiff,

      v.

OAK HILL CAPITAL PARTNERS III, L.P., OAK HILL CAPITAL MANAGEMENT PARTNERS III, L.P., OHCP GENPAR III, L.P., OHCP MGP PARTNERS III, L.P., OHCP MGP III, LTD., ROBERT MORSE, WILLIAM PADE, DAVID SCOTT, DEBRA DOMEYER, JEFFREY KUPIETZKY, ALLEN MORGAN, LAWRENCE NG, SCOTT JARUS, ELIZABETH MURRAY, TODD H. GREENE, and SCOTT MORROW,

      Defendants,

   and

ODN HOLDING CORPORATION, a Delaware Corporation,

      Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 12108-VCL

## MEMORANDUM OPINION

Date Submitted: February 4, 2020
Date Decided: May 4, 2020

P. Clarkson Collins, Jr., Lewis H. Lazarus, Matthew F. Lintner, K. Tyler O'Connell, Kirsten A. Zeberkiewicz, Kathleen A. Murphy, MORRIS JAMES LLP, Wilmington, Delaware; Steven Kaufhold, KAUFHOLD GASKIN LLP, San Francisco, California; *Counsel for The Frederick Hsu Living Trust*.

William M. Lafferty, Kevin M. Cohen, Alexandra M. Cummings, MORRIS, NICHOLS, ARSHT & TUNNELL, LLP, Wilmington, Delaware; John F. Baughman, Andrew J. Ehrlich, Alexia D. Korberg, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Counsel for Oak Hill Capital Partners III, L.P., Oak Hill Capital*

*Management Partners III, L.P., OHCP GenPar III, L.P., OHCP MGP Partners III, L.P., OHCP MGP III, Ltd., Robert Morse, William Pade, and David Scott.*

Jody C. Barillare, MORGAN, LEWIS & BOCKIUS, LLP, Wilmington, Delaware; Stephen D. Alexander, MORGAN, LEWIS & BOCKIUS LLP, Los Angeles, California; Marc J. Sonnenfeld, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania;, *Counsel for Debra Domeyer, Allen Morgan, Scott Jarus, Elizabeth Murray, Todd H. Greene, and Scott Morrow.*

Kurt M. Heyman, Samuel T. Hirzel, II, HEYMAN ENERIO GATTUSO & HIRZEL, LLP, Wilmington, Delaware; Douglas Fuchs, GIBSON, DUNN & CRUTCHER, LLP, Los Angeles, California, *Counsel for Lawrence Ng.*

A. Thompson Bayliss, April M. Ferraro, ABRAMS & BAYLISS LLP, Wilmington, Delaware, *Counsel for ODN Holding Corporation.*

**LASTER, Vice Chancellor**

Oak Hill Capital Partners is a private equity firm. One of Oak Hill's portfolio companies is ODN Holding Corporation, a holding company for Oversee.net.[1] Through Oak Hill Capital Partners Fund III,[2] Oak Hill owns a majority of the Company's common stock and all of its Series A Preferred Stock (the "Preferred Stock"). Oak Hill's holdings give it control over the Company at both the stockholder and board levels.

In 2010, Oak Hill was looking ahead to raising its next fund, Oak Hill Capital Partners Fund IV. The Oak Hill partners reached a consensus that the deal team assigned to Oversee should focus on monetizing the investment and achieving a return of capital.

The Oak Hill deal team set out to change the status quo at the Company. Oak Hill spent the last months of 2010 and the first months of 2011 trying to merge the Company with a competitor in a transaction that would support a leveraged dividend. When that deal fell apart, Oak Hill focused on its right to compel the Company to redeem its Preferred Stock at its liquidation preference of $150 million (the "Redemption Right").

The Redemption Right would not ripen until February 2013, but that was an advantage for Oak Hill. The Company was only obligated to redeem Oak Hill's shares of Preferred Stock out of legally available funds, so if the Company did not have funds, or if

---

[1] The parties refer to the entities interchangeably as "ODN," "Oversee," or the "Company." This decision follows their lead.

[2] Fund III consists of two entities: defendants Oak Hill Capital Partners III, L.P. and Oak Hill Capital Management Partners III, L.P., both of which are Cayman Islands exempt limited partnerships. Defendant OHCP GenPar III, L.P. is the general partner of the two limited partnerships. Defendant OHCP MGP Partners III, L.P. is the general partner of OHCP GenPar. For simplicity, this decision refers generally to Fund III.

the funds were not legally available, then the Company could not redeem Oak Hill's shares. If the Company had cash on its balance sheet that it did not need to run the business, then the Company would be required to use the money to redeem shares of Preferred Stock.

The delay before the Redemption Right ripened gave Oak Hill time to ensure that the Company would have as much cash as possible that it could use to redeem the Preferred Stock. Historically, the Company had invested its profits in organic growth or used it to make acquisitions. The Company's business plan for 2011 contemplated using cash for both purposes. In mid-2011, Oak Hill terminated the Company's CEO and instructed management to cut expenses to improve profitability. The Company had suffered reversals during the first half of 2011, and some degree of cost cutting was necessary to stabilize the business. With that task accomplished, however, Oak Hill kept the focus on the cash generation. When the Company sold two of its four business units in January 2012, it did not reinvest the proceeds. Throughout 2012, the Company continued to accumulate cash. Management projected that by year-end, the Company would have $55 million on its balance sheet.

With the exercise of the Redemption Right on the horizon, the Company's board of directors (the "Board") formed a special committee to negotiate with Oak Hill. In February 2013, Oak Hill told the committee that it was critically important for Oak Hill to receive $45 million by March. The committee agreed to that amount.

After the redemption, the Company continued to accumulate cash. The major source of the Company's net income was its Domain Monetization business. Although profitable, that business was in steady decline. In April 2014, the Company sold the Domain

2

Monetization business for $40 million. A second special committee approved the fairness of the price. A third special committee agreed to use all $40 million to redeem shares of Preferred Stock from Oak Hill.

The sale of the Domain Monetization business left the Company with only its Vertical Markets business. Over the next three years, the Company sold off that business in pieces. The Company persists as a shell with approximately $10 million in cash and a single, developmental-stage, travel-oriented website. But for this litigation, the Company would have been liquidated years ago.

Frederick Hsu co-founded the Company and is the second largest holder of its common stock after Oak Hill.[3] In this action, Hsu maintains that Oak Hill and its representatives on the Board breached their fiduciary duties by causing the Company to accumulate cash in anticipation of a redemption, rather than investing it in the Company's business to promote long-term growth. He asserts that senior officers of the Company and other members of the Board breached their fiduciary duties by going along with Oak Hill's cash-accumulation strategy.

Hsu proved that the cash-accumulation strategy conferred a unique benefit on Oak Hill by creating a pool of funds that the Company would be required to use to redeem Oak Hill's shares of Preferred Stock as soon as the Redemption Right ripened. Because the strategy conferred a unique benefit on the Company's controlling stockholder, the

---

[3] The actual plaintiff is The Frederick Hsu Living Trust, through which Hsu owns his shares of common stock in the Company. For simplicity, this decision refers to Hsu.

3

defendants had the burden at trial of proving that the pursuit of the cash-accumulation strategy was entirely fair.

The defendants proved at trial that the cash-accumulation strategy was entirely fair. The defendants proved by a preponderance of the evidence that the Company declined not because of the cash-accumulation strategy, but rather because of industry headwinds and relentless competition, most notably from Google, Inc. The defendants also proved by a preponderance of the evidence that if the Company had reinvested its net income, it could not have generated a return sufficient to create value for the holders of common stock. The record also showed that although Oak Hill had an interest in achieving a return of capital, Oak Hill's overall ownership position in the Company, including its ownership of a majority of the common stock, gave Oak Hill an incentive to create value for the common. Oak Hill wanted a return of capital, but Oak Hill also wanted to grow the Company, which it tried to do.

There is necessarily some lottery-like possibility that if the Company had reinvested its cash, then it might have achieved outsized success and created value for the common. As the largest holder of equity, Oak Hill would have benefited from that outcome more than anyone. Oak Hill, the Board, and the management team were not obligated to take a long-shot bet. They proved by a preponderance of the evidence that it was value-maximizing to accumulate cash and use it for redemptions.

Judgment will be entered for the defendants.

## I. FACTUAL BACKGROUND

Trial took place over ten days. The parties introduced 2,593 exhibits. Fifteen fact witnesses and three experts testified in person. Defendant Lawrence Ng testified remotely by video from Taiwan. The parties lodged forty-four depositions. The pre-trial and post-trial briefs collectively totaled 416 pages.[4]

The parties were able to agree on only eighty-nine stipulations of fact, and the voluminous evidence conflicted on many issues. Determining the historical facts, including the parties' motivations, is thus an imprecise exercise.

Recognizing that finding facts inherently involves uncertainty, courts evaluate evidence using a standard of proof with the burden of clearing that hurdle (and the consequence of losing if the burden is not met) assigned to a given party. For this case, the standard of proof was a preponderance of the evidence. *See Estate of Osborn ex rel. Osborn v. Kemp,* 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009), *aff'd*, 991 A.2d 1153 (Del. 2010). The burden of proof was assigned to the defendants under the entire fairness standard of review. *See Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012).[5]

---

[4] Citations in the form "[Name] Tr. [#]" refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep. [#]" refer to witness testimony from a deposition. Citations in the form "JX [#]" refer to joint exhibits from the trial record. Citations in the form "PDX [#]" or "DDX [#]" refer, respectively, to the plaintiff's demonstrative exhibits and the defendants' demonstrative exhibits.

[5] The plaintiff originally asserted a claim for breach of fiduciary duty, a claim for aiding and abetting a breach of fiduciary duty, and a claim for unjust enrichment. The plaintiff would have born the burden of proof on the latter two claims. *See In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 85 (Del. Ch. 2014) (holding that plaintiff bore the burden of proof on a claim for aiding and abetting a breach of fiduciary duty), *aff'd sub nom. RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015); *Otto v. Gore*, 45 A.3d

The allocation of the burden of proof ultimately did not play a major role in the case. The Delaware Supreme Court has explained that the real-world benefit of burden-shifting is "modest" and only outcome-determinative in "very few cases" where the "evidence is in equipoise." *Ams. Mining*, 51 A.3d at 1242 (internal quotation marks omitted). In this case, there was uncertainty about what in fact occurred and what would have happened if the defendants had pursued a different business strategy. The evidence, however, was not in equipoise.

## A.    The Company's Business

Ng and Hsu co-founded Oversee in 2000. Ng served as CEO and became the public face of the business. Hsu initially served as Chief Technology Officer, then later took on other roles with the Company. In 2006, Hsu stepped back from his managerial role, although he remained a director. *See* JX 45 at 5.

For its first seven years, Oversee enjoyed dramatic success. *See* JX 13. By 2007, the Company had expanded to 180 employees. Its annual revenue exceeded $200 million, and its net income exceeded $19 million. *See* JX 53 at 5. It had four lines of businesses.

The cornerstone of Oversee's success was the Domain Monetization business, which operated under the name "DomainSponsor." It generated approximately 80% of the Company's revenue. *See* Kupietzky Tr. 8.

---

120, 138 (Del. 2012) (holding that plaintiff bore the burden of proof on a claim for unjust enrichment). During post-trial briefing and argument, the plaintiff only pursued his claim for breach of fiduciary duty.

The Domain Monetization business capitalized on inefficiencies in the early Internet. To navigate to websites, users of the early Internet typed URLs directly into the address bar. Typographical errors, misspellings, and near misses were common. Early search algorithms were similarly primitive and gave priority to terms that appeared in the URL. If a user typed "seeking career" into an early search engine, the engine would give a higher priority in the search results to a URL with a name like "careerseeker.com." *See id.* at 8-10

Oversee developed technology that enabled the Domain Monetization business to cheaply amass a portfolio of domain names, most of which were multi-word strings, misspellings, or random assortments of characters that a user might enter. These domains led to "parked" websites that displayed automatically generated, minimalist content consisting of links to advertisers or key word searches, both provided by Google. If a user started at a parked domain and ended up clicking on an ad, then Google would collect advertising revenue from the owner of the link, and Google would share a portion of the revenue with Oversee.

Here is an example of the Company's sites:



If a visitor reached the site by misspelling "restaurant," and if the visitor then clicked on a link, such as "Gift Certificates," then the site would query Google using key words related to that subject. If a user clicked on one of the ads, then Google would collect advertising revenue from the owner of the link and share it with Oversee.

The Domain Monetization business was highly profitable. The Company benefitted from a favorable contract with Google under which the Company received preferred access to Google's search feed, and Google shared 74.4% of any advertising revenue with the Company. *See* JX 20 at 7. The cost of registering a URL was only around $10 per year, and a parked domain might generate, on average, $100 per year. *See* Kupietzky Tr. 10–13.

To maintain the profitability and scale of the Domain Monetization business, Oversee had to constantly acquire new domains. Until 2008, the organization that oversaw

8

domain name registrations allowed prospective buyers to try out a website for five days. The Company used this window to engage in a practice called "tasting," in which it evaluated URLs for their profitability before acquiring them. The Company was thus able to largely avoid losses on unprofitable URLs. *See id* at 15.

By 2007, Oversee's Domain Monetization business owned and operated a portfolio of approximately one million URLs. The Company had also expanded into managing URLs for other owners. Under its standard arrangement, Oversee would keep approximately 30% of the revenue it received from Google for a managed URL and hand over the rest to the domain name's owner. *Id.* at 16. By 2007, Oversee was managing a portfolio of approximately nine million URLs for other owners. *Id.* at 13.

Starting in 2005, Oversee sought to move up the domain-name value chain by establishing a lead-generation business, which came to be known as Vertical Markets. *See* JX 13 at 15. Lead-generation websites offer branded, consumer-focused content about a particular subject, such as mortgage loans, credit cards, or insurance. The sites gather information about their visitors and generate revenue by selling the information to companies that pay for sales leads. Current examples of lead-generation websites are Hotels.com, TripAdvisor, and Kayak. *See* Kupietzky Tr. 19; Morrow Tr. 158–60.

Creating a vertical markets business requires identifying an idea that can become the foundation for a website, then building a site that provides content and services for the targeted user. Ideally, the site and its brand are sufficiently different and become sufficiently well known to attract organic traffic. To gain traffic, however, a site typically must spend money on search-engine marketing ("SEM"), a practice in which the site pays

a search engine to appear on the search-results page in a location where the user is likely to click on a link to the site. Buying ad-words from Google is an example of SEM. A site also typically must invest in search-engine optimization ("SEO"), which means tailoring its site to rank highly in the search engine's organic search results. To establish and maintain a vertical markets site can easily cost at least one million dollars per year. *See* Kupietzky Tr. 22–23.

The Company developed its original lead-generation sites internally. Its first site was low.com, which allowed users to compare mortgages. The Company also developed a site that helped users find ringtones. *Id.* at 25. The Company purchased high-value domain names that could be used to build sites, such compare.com and information.com.

In 2007, the Company tried to expand into two lines of business that it hoped would complement the Domain Monetization business. The Company established its Aftermarket business by purchasing SnapNames, a firm that operated a secondary market for domain names. The Company established its Registrar business by purchasing Moniker, a firm that operated a domain registrar. Both businesses had higher expense profiles and lower margins than the core Domain Monetization business. Both businesses operated in competitive market segments and were relatively small. *See* Kupietzky Tr. 19–20, 26–27.

**B.      Oak Hill Invests $150 Million.**

By late 2006, Ng and Hsu wanted to monetize some of Oversee's success. They hired Bank of America Securities to explore a private placement of Oversee's securities, targeting a closing in mid-2007 and an investment in the range of $75–$100 million. PTO ¶ 31; *see* JX 11; JX 13 at 2; *see also* JX 20 at 9.

10

William Pade, a partner at Oak Hill, was one of the potential investors that Bank of America contacted. *See* JX 16. Pade was excited about the opportunity, and Pade and the Oak Hill team explored making a bigger investment than what Oversee had been seeking. *See* JX 17; JX 19. The talks initially did not lead to much, but later in the year, Oak Hill suggested partnering with Oversee on a potential acquisition. *See* Pade Tr. 357. Oak Hill's approach reignited discussions. *See* JX 24; JX 38; JX 39; JX 45. In December 2007, Oak Hill and the Company reached agreement on a transaction in which Oak Hill would invest $150 million in the Company in exchange for shares of preferred stock. PTO ¶ 36; JX 49. That same month, Oak Hill offered Ng "the opportunity to be a side fund investor" in Fund III, which he took. JX 47; JX 55.

To facilitate the investment, Oversee formed the Company and restructured itself as a wholly owned subsidiary of the Company. On February 12, 2008, the Oak Hill investment closed. *See* JX 64. Fund III paid $150 million to purchase 53,380,783 shares of Preferred Stock, reflecting an effective purchase price of $2.81 per share and post-money equity value for the Company of $403 million. JX 45 at 3, 5; JX 49 at 6. Fund III has always been and remains the only holder of the Preferred Stock. The Company has not authorized or issued any other class or series of preferred stock.

The shares of Preferred Stock carried a liquidation preference equal to their purchase price and were convertible into an equal number of shares of common stock at $2.81 per share. JX 49 at 59. On a fully diluted basis, the Preferred Stock represented a 34% ownership stake in Oversee. The shares did not pay any type of dividend and would only have upside if the Company's value exceeded the conversion price. *See* JX 201 at 4.

11

When Oak Hill invested, Oak Hill anticipated an initial public offering in two to three years. *See* JX 45 at 21.

The terms of the Preferred Stock included the Redemption Right, which Oak Hill could exercise after five years. *See* JX 68 art. V § 6. The pertinent language stated:

> At any time after February 12, 2013, upon the written request of the holders of at least a majority of the then outstanding shares of [Preferred Stock], the [Company] shall redeem, out of funds legally available therefor, all of the outstanding shares of [Preferred Stock] which have not been converted into Common Stock pursuant to Section 4 hereof (the "**Redemption Date**"). The Redemption Date shall be determined in good faith by the Board and such Redemption Date shall be at least thirty (30) days, but not more than sixty (60) days, after the receipt by the [Company] of such written request. The [Company] shall redeem the shares of [Preferred Stock] by paying in cash an amount per share equal to the Original Issue Price for such [Preferred Stock], plus an amount equal to all declared and unpaid dividends thereon (as adjusted for stock splits, stock dividends and the like, the "**Redemption Price**"). If the funds legally available for redemption of the [Preferred Stock] shall be insufficient to permit the payment to such holders of the full respective Redemption Prices, the [Company] shall effect such redemption pro rata among the holders of the [Preferred Stock] . . . .

*Id.* § 6(a).

If the Company did not have sufficient funds to redeem the Preferred Stock, then the Redemption Right contemplated ongoing redemptions as funds became available. The pertinent language stated:

> If the funds of the [Company] legally available for redemption of shares of [Preferred Stock] on any Redemption Date are insufficient to redeem the total number of shares of [Preferred Stock] to be redeemed on such date, those funds which are legally available will be used to redeem the maximum possible number of such shares ratably among the holders of such shares to be redeemed based upon their holdings of [Preferred Stock]. The shares of [Preferred Stock] not redeemed shall remain outstanding and entitled to all the rights and preferences provided herein. At any time thereafter when additional funds of the [Company] are legally available for the redemption of shares of [Preferred Stock] such funds will immediately be used to redeem

12

the balance of the shares which the [Company] has become obliged to redeem on any Redemption Date, but which it has not redeemed.

*Id.* § 6(d).

Oak Hill, Ng, and Hsu entered into a stockholders agreement in which they agreed that the Board would have seven members: three designated by the holders of a majority of the common stock (the "Common Directors"), two designated by Oak Hill (the "Series A Directors"), and two remaining directors be selected by unanimous agreement of the other five (the "Additional Directors"). *See* JX 67 at 13–14 (the "Stockholders Agreement"). The two Oak Hill partners responsible for the investment—Pade and Robert Morse—joined the Board as the Series A Directors.

Under the Stockholders Agreement, Oak Hill received a drag-along right that it could exercise if the Company did not complete a Qualified Initial Public Offering before February 12, 2013. *See id.* at 15–16 (the "Drag-Along Right"). Generally speaking, and subject to various caveats, the Drag-Along Right obligated the Company and Oak Hill to negotiate for thirty days on terms for the Company to repurchase Oak Hill's shares. If the parties could not agree, then Oak Hill could cause the Company to engage in a "Change in Control Transaction." *See id.*

The Company used $73 million of the proceeds to pay down its line of credit. The Company paid out another $67.5 million to its founders, with $37.125 million going to Ng and $30.375 million to Hsu. PTO ¶ 41.

13

## C.  The Oak Hill Settlement

When Oak Hill invested, the goal was to grow Oversee into a billion dollar company. *See* JX 54; JX 56 at 2, 3. The first half of the year saw the Company performing well, albeit below its targets. *See* JX 81 at 2; JX 86 at 22. Part of the problem was Google, which began a multi-year effort to consolidate the online advertising market. The Company's early relationship with Google had been symbiotic, because Oversee's parked domains generated traffic for Google. By 2008, however, Internet users had shifted away from direct navigation and predominantly were using search engines, where Google dominated. In May 2008, Google told the Company that it wanted to renegotiate its contract to give the Company a lower share of revenue and eliminate the Company's preferred access to Google's search feed. *See* Kupietzky Tr. 14–15, 16–17. Google achieved both outcomes, and under the Company's new agreement, its share of advertising revenue from Google declined from 74.4% to 66.3%. JX 523 at 2.

The organization overseeing the registration of domain names also changed the dynamics of the Domain Monetization business for the worse by eliminating the five-day "tasting" window. This meant that the Company no longer had the ability to evaluate a domain name before buying it. The Company now had to take the risk of spending $10 on a domain name that might not generate any money. *See* Kupietzky Tr. 15.

With the Company's business deteriorating, Oak Hill pushed Ng to step aside in favor of a professional CEO. *See* JX 241 at 2, 12. During the second half of the year, Oak Hill led a search for an outside CEO, but after the chosen candidate was lured away, the

14

Board promoted Jeff Kupietzky from Executive Vice President to President. *See* Kupietzky Tr. 32; JX 155; JX 156; *see also* JX 241 at 2, 12; JX 523 at 2.

The latter half of 2008 also witnessed the onset of the Great Recession, which affected online advertising. *See* JX 138; JX 145. The Domain Monetization and Vertical Markets businesses depended on online advertising, and when Oak Hill invested, online advertising was expected to grow by 15–20% per year. JX 523 at 2. Instead, spending on online advertising only grew by 10.6% in 2008 and declined by 3.4% in 2009. *Id.* The Great Recession also led to structural changes in the market for subprime loans, which devastated low.com, Oversee's principal Vertical Markets business. *See* JX 523 at 2.

Oak Hill used the events of 2008 to re-negotiate the terms of its investment. *See* JX 201 at 2. In November 2008, Oak Hill presented Ng with an "Issues List" and threatened to sue. *See* JX 163. On December 31, 2008, Oak Hill, Ng, Hsu, and the Company entered into a settlement agreement. JX 195. No funds were returned to Oak Hill. Instead, Ng and Hsu granted Oak Hill options to purchase large blocks of their common stock at an exercise price lower than the price at which Oak Hill invested. PTO ¶ 45. The parties amended the Drag-Along Right so that it would ripen on February 12, 2013, but could only be exercised if Oak Hill had made a redemption request that was not honored; otherwise, Oak Hill could not exercise the Drag-Along Right until February 12, 2015. PTO ¶ 46. The settlement consideration also included an amendment to the Redemption Right which provided that if the Company lacked sufficient funds legally available to redeem the Preferred Stock in full, then the Company would

15

take all reasonable actions (as determined by the [Board] in good faith and consistent with its fiduciary duties) to generate, as promptly as practicable, sufficient legally available funds to redeem all outstanding shares of [the Preferred Stock], including by way of incurrence of indebtedness, issuance of equity, sale of assets, effecting a Deemed Liquidation Event or otherwise.

JX 203 at 11.

After the settlement, Ng resigned as CEO. Ng nominally remained Chairman of the Board, but he relocated to China, reduced his involvement in the Company's affairs, and focused on other projects. Hsu Tr. 2206; Ng Tr. 627–28, 639; Kupietzky Dep. 33–34; *see* JX 201 at 2; JX 354 at 3.

Under Oak Hill's guidance, Kupietzky took significant actions to restore the Company's profitability, including a significant reduction in force. *See* Kupietzky Tr. 33–34; JX 241 at 2, 12. From April 2009 onward, the Company performed "ahead of budget." JX 354 at 8. Oak Hill was again optimistic about the Company. *See id.* at 11.

**D.      Oak Hill Becomes The Company's Controlling Stockholder.**

In August 2009, Ng and Hsu approached Oak Hill about buying the rest of their shares. *See* JX 288 at 2. Ownership of a majority of the common stock would give Oak Hill the right to appoint the three Common Directors in addition to the two Series A Directors, conferring full control at the board level. In late October and early November, Oak Hill paid $32 million to buy 41,788,257 shares of common stock from Ng and Hsu, comprising 53.7% of the common stock and reflecting a purchase price of $0.77 per share.[6]

---

[6] *See* JX 395; JX 396; JX 409; JX 412; JX 523 at 2. The events leading to Oak Hill's purchase were complicated, contentious, and ultimately not particularly relevant to the merits of this case. In short, after Oak Hill made an offer for Ng and Hsu's shares, Hsu changed his mind and sought to purchase Ng's shares so that he would have control over a

16

Oak Hill's purchase of a majority of the common stock increased Oak Hill's equity ownership on an as-converted basis from 41% to 73%. JX 347 at 1. While solely a holder of the Preferred Stock, Oak Hill could not receive more than $150 million at valuations below $403 million, when it became economically rational to exercise its conversion right. As an owner of common stock, Oak Hill would share in any value creation at prices above its purchase price of $0.77 per share. When seeking approval for the investment from Oak Hill's Investment Committee, the deal team presented a chart showing how the purchase affected Oak Hill's return profile, with the return from the common stock (green) layered above the return from the preferred (blue) and the additional wedge of value from the



majority of the common stock and be able to appoint the three Common Directors. *See* JX 305; JX 315. For a time, Ng seemed to have agreed to sell to Hsu. *See* JX 319. That outcome was unacceptable to Oak Hill, *see* JX 317 at 1–2, and Pade and Morse threatened to take hostile actions against the Company if Hsu acquired Ng's shares, *see* JX 318 at 1–2; JX 320. Ng then reneged on his agreement with Hsu and agreed to sell to Oak Hill at a higher price. *See* JX 332; JX 333; JX 337; JX 338; JX 341. Once Hsu had lost the deal, he exercised a co-sale right that enabled him to sell a portion of his shares to Oak Hill in place of a portion of Ng's shares. *See* JX 340. The transaction left Hsu embittered towards both Ng and Oak Hill. *See, e.g.*, JX 342; JX 348 at 1–2; JX 460; JX 469. He filed a lawsuit challenging the transaction, but was forced to dismiss it with prejudice to complete the sale of his shares under his co-sale right. *See* JX 385; JX 413.

17

options that Oak Hill obtained on Ng and Hsu's shares as part of the 2008 settlement (orange). *See* JX 354 at 5.

Equally important, the purchase of common stock gave Oak Hill control over the Board. As the deal team explained to Oak Hill's Investment Committee, "[t]he Preferred and common stock holders begin to have aligned economic incentives when the value of Oversee exceeds the Preferred conversion price, but these interests diverge below the conversion price." JX 354 at 7. The deal team stressed that "[i]n scenarios where the company struggles, the value of control to Oak Hill is significant." *Id.* Buying the common stock gave Oak Hill "the ability to control the timing and manner of our ultimate exit." *Id.*; *see* JX 347 at 1 (noting that the purchase gave Oak Hill "complete control of the Board" and that moving into a control position had "a lot of benefits to our existing $150mm preferred position, as we can decide when and how we exit"); JX 357 ("[W]e are investing in control in order to protect our investment from Fred's control . . . ."); JX 450 ("OHCP III will clearly benefit from majority control of the Board.").

Oak Hill's purchase of common stock left Ng with approximately 14 million shares and Hsu with approximately 20 million shares. JX 431. After Oak Hill acquired full control, Hsu resigned from the Board. JX 424.

E.     **Oak Hill Wants A Return Of Capital.**

Oak Hill's partners regularly review their portfolio companies. During a meeting in May 2010, the Oak Hill deal team reported that the Company's business had performed well in 2009 and first quarter of 2010, with results slightly ahead of its budget. *See* JX 523 at 2, 6. The deal team recommended "continuing to hold this investment, while actively

18

evaluating opportunistic M&A and sale opportunities," with an anticipated exit in late 2012 or early 2013. *Id.* at 2, 3, 12. The other Oak Hill partners, however, focused on "exit timing" and "monetization strategy." JX 524. The "consensus" was for the deal team "to take action to realize value sooner rather than later." *Id.* One option was "a merger with a strategic that would allow us to take some of our preferred off of the table and roll some into common with a better go-forward return profile than our status-quo." *Id.* The other option was to "[t]ry to sell now to get back at least our $150 million." *Id.* Oak Hill's managing partner, J. Taylor Crandall, "urged [the deal team] to crank up the focus on our monetization strategy." *Id.*

During the same month, Kupietzky entered into a new agreement with the Company. JX 532. Kupietzky had complained to Pade and Morse that his shares of common stock only would have value after Oak Hill had received $150 million. Kupietzky Tr. 38–39. To align Kupietzky's interests with Oak Hill, Pade and Morse agreed to a bonus arrangement based on the amount of proceeds received by both the preferred and the common, thereby entitling Kupietzky to share from dollar one with Oak Hill. *See, e.g.*, JX 478, JX 483, JX 487. Kupietzky's intention was to make sure that "if Oak Hill took money, [he] would get paid." Kupietzky Tr. 138.

In September 2010, Oak Hill's Portfolio Performance Management Committee reinforced the need for the various deal teams to focus on realizations, liquidity, and exits. *See* JX 569. Under a heading titled "Next 18 months liquidity opportunities," the committee noted that Oak Hill would likely be starting the process of raising Fund IV during spring 2012, and "a necessary condition" for successful fundraising "will be that we return more

19

than the $160 million predicted in the portfolio reviews over the coming year and a half." *Id.* at 2.

In October 2010, Oak Hill filled Hsu's long-vacant Board seat with a third Oak Hill representative, David Scott. Then a principal of Oak Hill and member of the Oversee deal team, Scott later became a partner with the firm. *See* PTO ¶¶ 15, 58; JX 586.

Also in October 2010, Kupietzky presented Oak Hill with his vision for growing the Company. *See* JX 2541. He set an aggressive goal of converting the Company's 300 million monthly visitors into 10 million repeat customers. *Id.* at 9. He hoped to achieve this by creating a "Membership Mall" of lead-generation businesses spanning at least five vertical markets and supported by shared infrastructure. *Id.* at 10–13. To carry out this plan, he needed:

- "[D]edicated resources for R&D [to] improve company ability to build new products"

- "[S]trong leadership for management of [vertical markets] unit"

- "[D]edicated resources for M&A"

- "Changes in existing org structure and individuals to support new plan"

- "Sufficient capital for acquisitions"

*Id.* at 16; *see* Kupietzky Tr. 77–83. Kupietzky provided Oak Hill with a chart depicting the likely trajectory for the Domain Monetization business depending on whether the Company sought to (i) "maintain" the business by investing in alternative monetization strategies, new efforts at optimization, and efforts to respond to Google or (ii) "harvest" the business by limiting investment in these areas. JX 2541 at 25. In both scenarios, the business would

decay, but Kupietzky anticipated the drop in the first scenario would be 35% less than the more rapid falloff in the second scenario. *Id.*

By December 2010, Kupietzky perceived Oak Hill's desire for a return of capital as a potential constraint. He expressed concern that if he did not "grow the business quickly through acquisition then Oak Hill will do a dividend recap." JX 615. He identified the most important objective for the Company as "[d]iversify from parking business to growing lead [generation] business." JX 2546 at 1. He regarded the "Board's desire for dividend" as his biggest personal challenge for 2011. *Id.* at 2; *see* Kupietzky Tr. 91.

## F. The Company At The Beginning of 2011

When 2011 began, the Company still had four lines of business: Domain Monetization, Vertical Markets, Aftermarket, and Registrar. The Aftermarket and Registrar businesses were subscale and needed to be sold. No one disputes that selling these businesses was the right course of action to take. The debate concerns whether the Company did the right thing by not reinvesting the proceeds in its business.

Domain Monetization continued to be the Company's financial cornerstone. JX 642 at 10; *see* JX 753 at 14. During 2010, it generated $174 million in revenue and $25.1 million in EBITDA. JX 753 at 14. But it was vulnerable to steady erosion by Google. *See* JX 642 at 3 ("Google concentration is declining . . . but still an <u>overhang on franchise value and must be further reduced</u>."). At the end of 2010, Company management projected 12% annual decay in revenue over the next three years. *See* JX 616 at 7.

The Vertical Markets business operated sites in three categories:

21

- "Travel: Provides metasearch for online airfare through www.lowfares.com as well as airport parking reservation services through www.aboutairportparking.com." JX 642 at 15.

- "Finance: Provides credit card comparison and personal finance information through websites including www.creditcard321.com and www.creditcards.org (acquired at the end of 2009)." *Id.*

- "Retail: Provides comparison shopping services for consumers and serves as a lead generation provider to online retailers through www.shopwiki.com and other international websites (ShopWiki was acquired in Nov. 2010)." *Id.*

The Vertical Markets business was profitable, generating $30 million in revenue and $10 million in gross profit in 2010. *See id.* at 9.

If the Company was to grow, then Vertical Markets would be the vehicle. In December 2010, the Company hired Scott Morrow as a Senior Vice President and General Manager of the Vertical Markets business with the expectation that it would be the Company's "*high growth* division." JX 595 at 1; *see* JX 621; JX 636; JX 653; *see also* JX 880 ("Vertical markets is the high growth business . . . ."). Acquisitions would likely be a key driver of growth, because as Oak Hill's deal team observed in January 2011, "Oversee has sourced lead generation acquisitions at reasonable multiples and then grown them post-acquisition by using Oversee's insights into monetization trends. It has not been successful at organically creating these verticals." JX 642 at 10.

At the end of 2010, the management team at the Company consisted of Kupietzky as CEO, Elizabeth Murray as Chief Financial Officer, Debra Domeyer as Chief Technology Officer, and Todd Greene as General Counsel. The Board consisted of eight directors. Pade, Morse, and Scott represented Oak Hill. Kupietzky held a seat as CEO. Ng

22

continued to serve as Chairman. The remaining three directors were not affiliated with Oak Hill or management: Allen Morgan, Scott Jarus, and Kamran Pourzanjani. *See* JX 737.

Overall, 2010 had been solid year for the Company. JX 642 at 3; JX 723 at 2. Revenue in 2010 grew by 9.4% to $174 million, and EBITDA grew by 1.1% to $25.1 million. The Company met its budget. JX 723 at 2; *see id.* at 8. The main disappointment was revenue from acquisitions, where Oversee anticipated incremental revenue of $20 million and only achieved $3 million. JX 657 at 8.

On January 19, 2011, the Board approved the Company's business plan for 2011 (the "2011 Plan"). JX 661 at 3. It called for (i) divesting the Aftermarket and Registrar businesses; (ii) supporting Domain Monetization through domain name acquisitions, optimization, and international growth; and (iii) growing Vertical Markets internally and through acquisitions. JX 658 at 8. To achieve these goals, the 2011 Plan budgeted $42 million for acquisitions in 2011. *Id.* at 22; *see* Kupietzky Tr. At 53–55.

Kupietzky did not have specific acquisition targets in mind; he anticipated finding accretive acquisitions. In accordance with the Company's normal practice at the time, the Board received an M&A pipeline update from Ryan Berryman, the Company's head of Corporate Development. The plan identified twenty potential targets for the Vertical Markets business. *See* JX 657 at 33; JX 725; JX 725.1 (describing management 2011 "goals" for Kupietzky, Berryman, Nelson and others, all focused on growth). The 2011 Plan contemplated hiring twenty-four new employees. JX 658 at 23.

Kupietzky regarded the 2011 Plan as contemplating "moderate" growth. Kupietzky Tr. 101. Kupietzky explained at trial that there were always three basic paths for Oversee:

23

(i) a harvest strategy, in which management maximized profitability without investing in new initiatives, (ii) a modest investment strategy, in which management looked for opportunities to support the core business and to invest where the Company had a competitive advantage, and (iii) an aggressive investment strategy that contemplated a venture-capital approach to growth without regard to near-term profitability. *Id.* Kupietzky believed that the 2011 Plan pursued the middle route. *Id.*

## G.    Oak Hill Decides To Change The Status Quo.

In a January 2011 presentation to the firm's partners, the Oak Hill deal team explained that the team's focus had shifted "to an overall review of Oversee's strategic direction" that included pursuing "either larger M&A or a shareholder dividend." JX 642 at 3. The deal team also advised the Oak Hill partners that "[o]ptimal outcomes will require changes to the senior management team." *Id.* Elaborating on both points, the Oak Hill deal term stated:

- "We intend to either utilize available debt capacity to fund a larger acquisition in 2011 or seek a dividend recap that could return $35-$40 million to Oak Hill." *Id.* at 10; *accord id.* at 16.

- "CEO Jeff Kupietzky and his team have stabilized Oversee and established good operational controls and processes over the past two years. However, we believe an optimal outcome for Oak Hill will require future changes to the senior team." *Id.* at 10.

After speaking with Morse, the Company's investment banker at Jefferies & Company noted that "[e]xit options are really weighing on him." JX 667.

In a March 2011 update to the firm's partners, the Oak Hill deal team confirmed that although "Oversee met its EBITDA budget and has returned to growth," the deal team

24

was "unsatisfied overall with Company performance" and "engaged in a series of actions to improve our expected outcomes." JX 723 at 2. Later in the presentation, after describing the returns under the existing business plan, the deal team recommended against maintaining the "status quo" at Oversee. *Id.* at 11. The team elaborated:

- "EBITDA growth of 10-12% builds value primarily for the common equity (of which [Fund III] owns approximately half)." *Id.*

- "Oak Hill's preferred does not participate in value creation until equity values above $403 million, and with a net cash position, there is not leverage between enterprise value and equity value creation for the preferred." *Id.*

- "A transformative M&A transaction, a change to the capital structure, or a change to the growth profile would be necessary to support an extended hold period." *Id.*

Rather than accepting the status quo, the deal team embarked on a "staged action plan" that involved (i) selling the Registrar business, (ii) "engag[ing] in transformative M&A discussions with three industry players," and (iii) evaluating changes in senior management. *Id.* at 2. The team again identified a "dividend recap transaction" as a possible means of returning capital, "but best sequenced as a late-2011 event, possibly tied to the preferred maturity, absent a strategic transaction." *Id.*

Oak Hill spent much of its energy during the five months of 2011 pursuing a transformative M&A transaction with NameMedia, which Oak Hill regarded as "an excellent strategic fit" with Oversee. *Id.* at 12. The Oak Hill team believed that the combined company could support "additional leverage, funding a distribution to shareholders." *Id.* Oak Hill worked with Summit Partners, the private equity sponsor of NameMedia, to develop a transaction. *See, e.g.*, JX 757.

Because of Oak Hill's desire to receive a return of capital from the NameMedia deal, the Board formed a special committee comprising the three non-Oak Hill directors: Jarus, Morgan, and Pourzanjani. *See* JX 790 at 3–4. As originally constituted, the resolutions gave the committee the exclusive power and authority to determine whether a recapitalization would take place and on what terms. JX 822 at 3–4; *see* JX 809 at 2. Morgan objected to the full delegation of authority. He believed that "in general, the Special Committee should closely 'ride shotgun' to the majority shareholder of Oversee as they work out a deal that is acceptable to them." JX 809 at 2. At that point, the committee would "make a recommendation to the Board" and "[i]f the Board wants to recommend the Potential Transaction over the objection of the Special Committee, I think that's fine." *Id.*; *see* Morgan Tr. 1627–28. The final resolutions gave the committee a reduced role: A recapitalization would require the committee's approval, but the committee did not have the power to set the terms of the deal. *See* JX 822 at 3–5.

In early May 2011, the NameMedia deal fell apart. The banks would not provide a financing package that contemplated a dividend. *See* JX 830; JX 831. Without bank financing, the combined business could not generate enough distributable cash to satisfy NameMedia's owners. *See* JX 837 at 1; JX 840 at 4–5; JX 844 at 1.

As the prospects for the NameMedia deal receded, Oak Hill examined whether the Redemption Right could provide a means of obtaining a return of capital. *See* JX 720. Under this court's decision in *SV Investment Partners, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973 (Del. Ch. 2010), the Company would only be able to redeem the Preferred Stock to the extent it had legally available funds. In March 2011, Greene sent a summary of the

*ThoughtWorks* case to the Company's outside counsel at Hogan Lovells and scheduled a call to discuss it. *See* JX 747; Greene Tr. 1967–69. In April, Oak Hill's lawyers at Wilson Sonsini Goodrich & Rosati, P.C. delivered a twelve-page memorandum analyzing Oak Hill's rights under the Preferred Stock. *See* JX 770; JX 801; *see also* JX 850.

Oak Hill also remained interested in changing the leadership team at the Company. In March 2011, Oak Hill had asked Jarus to meet with the management team to understand "the senior management team dynamics." JX 723 at 6. At the end of April, he delivered his report. In his introduction, he cautioned that

> by the very nature of my conversations with the [executive team], most of what I heard were negative observations or complaints. This was a venting process with an "outsider" who was willing to listen. The reader of this report should not assume that "the sky is falling." . . . Without exception, everyone believes that ODN is a valuable company with tremendous assets at its disposal.

JX 800 at 2. That said, the report contained blunt commentary:

- "There is a keen recognition within the [executive team] that ODN's business must change. The company's current business model is broken and unsustainable. External influences and the lack of control over its own destiny have become overwhelming." *Id.*

- "[T]there is concern about ODN's ability to execute successfully on the acquisitions which have been made (*i.e.*, grow the businesses/vertical market), and on whether there really is any synergy between ODN's core business (particularly the [owned and operated] traffic) and its acquired vertical markets business." *Id.* at 4.

- "There was a general theme that the goals of the organization, particularly its financial goals (i.e. budget), were set to meet Oak Hill's expectations, as opposed to being a realistic reflection of the current markets, external influences, and/or ODN's execution capabilities." *Id.*

- "[T]here is a sense that many decisions need to be brought up to Oak Hill Capital *before* they are executed (i.e. the CEO does not have the authority to be making these decisions without Oak Hill's consent)." *Id.* at 5.

27

- "The biggest challenge to the success (and survival) of ODN is the lack of a clear, articulated, well-communicated and decisive strategic direction for the company." *Id*. at 7.

## H. The Company's Performance Suffers.

While Oak Hill was pursuing the NameMedia deal, the Company's performance suffered. In February 2011, Google released the first of a series of updates to its search algorithm, later known as "Panda." PTO ¶ 61; JX 2566 ¶ 28; Jerath Tr. 2458. The updates were designed to assign lower search rankings to domains that lacked original content or carried other indicia of being lower quality sites. *See* JX 710; JX 712 at 1; JX 714; JX 769. Panda affected all of Oversee's businesses, and it caused ShopWiki's traffic to decline by 30–40% during the first quarter. JX 782A at 36.

The Google updates did not immediately have a major impact on the Company's results: its gross revenue of $45.6 million for the first quarter fell just short of budget at $46 million, and its EBITDA of $5.4 million also fell just short of budget of $5.6 million. *Id.* at 4. But the negative effects continued into April and May. *See* JX 824 at 4–5; JX 825. Google made matters worse by providing its search feed to other domain monetization companies, who competed aggressively with the Company. *See* Kupietzky Tr. 56; JX 825.

Oak Hill decided it was time to remove Kupietzky. *See* JX 723 at 2. In February 2011, Morse had told Pade and Scott that they needed to "change the CEO." JX 693. At the end of May, Morse proposed to the rest of the Board that they fire Kupietzky and establish an "Office of the CEO" comprising the balance of the senior management team. JX 840 at 4–6.

On June 7, 2012, Pade and Morse met with Kupietzky and told him he was relieved of operational responsibility. *See* JX 855. Kupietzky would leave the Company on September 2. In his place, Pade and Morse established an "Operating Committee" comprising the remaining members of senior management: Morrow, Domeyer, Murray, and Greene. *See id.*; JX 856. Morrow and Domeyer received the titles of Co-President. *See* JX 866. At its next meeting, the Board signed off on the changes. *See* JX 869.

Pade and Morse also made other changes in the executive team. After they had explained to Kupietzky the "change in approach to operating the business," Kupietzky agreed that "several other members of the management team were no longer in productive roles." JX 856 at 1; *see* Kupietzky Tr. 62–63, 129–30; Pade Tr. 483–86. The surplus executives included Berryman, the Vice President for Corporate Development, and Jack Nelson, the Head of Human Resources. JX 856 at 1. From Kupietzky's standpoint, it made sense to let Berryman go in light of Oak Hill's new "cost-cutting strategy." Kupietzky Tr. 127–30; *see also* JX 846 at 1 (Jarus noting in June 2011 that Berryman's "job/responsibilities seem to have bled away").

For help in reorienting the Company, Oak Hill turned to Jefferies, which had been advising the Company and Oak Hill on the NameMedia transaction. Oak Hill asked Jefferies and management to analyze a sale of the Domain Monetization business,[7] which

---

[7] *See* JX 840 at 4 (Morse reporting that Oak Hill had "spoken with David Liu at Jefferies about helping do a market check to understand what the market for the core domain monetization asset might be"); JX 844 at 1 (Kupietzky reporting that Jefferies had been engaged with a "primary focus" on marketing "the Monetization business on a stand-alone basis"); JX 2471 (Greene reporting that NameMedia deal "is off" and "[w]e are

could generate cash for a redemption while preserving the Vertical Markets business to be managed for possible upside. *See* JX 840 at 6; *cf.* JX 819 (Ng suggesting similar strategy). Oak Hill also asked Jefferies about other options that would generate liquidity, including selling the Company as a whole and adding debt to support a leveraged dividend. *See* JX 820. Oak Hill even asked Jefferies to explore splitting the Company in two, with the Preferred Stock remaining with the Domain Monetization business so that its cash flows could be used to pay it down, and with Vertical Markets spun off as a second company that could seek venture financing. *See* JX 828; Kupietzky Tr. 117–19.

On June 30, 2011, Jefferies gave a presentation to the Board. *See* JX 887. The materials noted that "[m]anagement and the Board are evaluating potential changes to the Company's long-term strategy, investment opportunities and underlying expense structure." JX 885 at 4. The Company's strengths included its portfolio of domain names, its high number of monthly unique visitors, its profitable business model, and its relationship with Google. *Id.* at 6. The Company's weakness included its dependence on the Google relationship, the erosion of its Domain Monetization business, and the fact that its Vertical Markets business remained "subscale and concentrated in travel." *Id.* After discussing the segments in greater detail, Jefferies outlined four non-exclusive alternatives: (i) invest in growth, (ii) optimize for profitability, (iii) segment sales, and (iv) a whole-company sale. *Id.* at 13. The presentation warned that while optimizing for profitability

---

working on retaining Jefferies to conduct a market check for sale of our monetization business"); *see also* JX 855 at 30; JX 874 at 1–2.

30

could "increase cash flow in the short to medium term," it could "limit near term potential for value creation through organic growth and inorganic growth." *Id.* The segment sales offered the opportunity for a "[p]artial liquidity event for shareholders" and had the potential to "maximize valuation" through a sum-of-the-parts approach, but the remaining segments could be subscale and have limited profitability. *Id.*

After the meeting, Pade and Scott gave the Operating Committee a series of questions to answer. They included determining whether the Domain Monetization business could be stabilized and evaluating whether its traffic could be used to support the Vertical Markets' business "for valuation advantage." JX 888 at 1. Pade and Scott also wanted to know if (i) the Company could grow the Vertical Markets business organically and (ii) if there were acquisitions that would "move the needle and incorporate synergies." *Id.* Pade and Scott indicated that they had been "unimpressed" with the Company's acquisitions so far. *Id.*

Based on the discussion during and after the Board meeting, the Operating Committee understood that Oak Hill and the Board were not focused on selling the Company in the near term. *See* JX 894 at 2. The primary goal was to optimize for profitability by making "bold" cuts to SG&A.[8] In terms of longer term strategy, the

---

[8] JX 906; *see* JX 894 at 4 (indicating that Pade said to cut "millions in SG&A"); *id.* (observing that "[t]here will be some things we do that we cut that we'll regret"); *see also* JX 925 at 2 (Jefferies call report stating Murray reported that "[the Operating Committee is] presenting to the board on 8/17 a plan for 2012 . . . will likely include substantial cost cuts."); JX 954 at 2 ("[T]here is full expectation by Oakhill [sic] and the Board that we will be reducing our SGA.").

31

Operating Committee analyzed options for selling either Domain Monetization or Vertical Markets. *See* JX 894.

In July 2011, the Operating Committee met again with Oak Hill. *See* JX 898; JX 900; JX 901; JX 902. Domeyer presented possible scenarios for Domain Monetization. *See* JX 901. Morrow presented a plan for Vertical Markets. *See* JX 900; JX 901; JX 902. After describing the attractive features of the Vertical Markets business, Morrow explained that Oversee's business model was "overwhelmingly search engine focused" with 79% of visits coming from search engines. JX 902 at 20. He then explained how Google favored its own vertical markets sites and those of its paid advertisers on the results page. *See id*. at 21–27. This meant that Google could dramatically affect the performance and profitability of the Company's sites. *See* JX 902 at 30.

After the meeting, Pade and Scott pushed Murray to implement significant expense cuts, including a reduction in force. JX 906. Oak Hill also asked the Operating Committee to meet with Jefferies to refine their strategic thinking. JX 923. A significant point of debate in selecting the Company's strategy was whether the Domain Monetization traffic could be used to support growth in the Vertical Markets business, or whether the Company needed to invest directly in building up Vertical Markets. Domeyer favored the former. Morrow favored the latter. During the call with Jefferies, Morrow gave a ballpark estimate that "to execute on the vertical markets strategy he would need $15 - $20M." JX 923; *see* Morrow Tr. 257–59; *see also* JX 889 (Morrow writing on June 30, 2011 "there are opportunities to grow. However, the investment for growth is not complete. We need to

invest aggressively in infrastructure/marketing services . . . " and that "an M&A deal" could quickly help build out capabilities).

The Operating Committee met again with the Oak Hill team in August. JX 944. The Operating Committee recommended Domeyer's approach: Oversee would attempt to pivot from "'Domain Parking' to 'Traffic Marketing'" by using its Domain Monetization traffic to support growth in its Vertical Markets business. *Id.* at 6, 16. Consistent with Oak Hill's focus on optimizing for profitability, the team proposed significant cuts, including a reduction of thirty-four employees. *See id.* at 39–45. The cuts would reduce the SG&A expense from $3 million per month in 2011 to a projected SG&A expense of $1.8 million per month in 2012. *Id.* at 44. The Board signed off on the initiatives at its August 30 meeting. *See* JX 948; JX 952.

In September 2011, the Operating Committee implemented the layoff. JX 980. That same month, Pade approved new bonus agreements for the members of the Operating Committee that aligned their personal economic interests with Oak Hill's interests in achieving a redemption. The members of the Operating Committee asked for the same deal Kupietzky had, which paid him a bonus for every dollar received by Oak Hill. *See* Greene Tr. 1917–18. Oak Hill refused, agreeing only to pay a bonus once Oak Hill received at least $75 million. Greene Tr. 1922, 1980–81. In September, Pade informed each member of the Operating Committee that "Oak Hill has decided" to grant them bonuses approximating 1% to 2.5% "ownership of the Preferred Shares if and when the aggregate value of the Preferred Shares exceeds $75MM." *See* JX 970; JX 971; JX 972; JX 973. *See generally* JX 1582 (describing terms).

33

By October 2011, the Oak Hill deal team was focused on building up cash at the Company in anticipation of the Preferred Stock maturing in February 2013. In a presentation to the Oak Hill partners, the deal team reported that the Company's business had stabilized and begun to show improvement. *See* JX 1009 at 2. The team then explained:

- "As a reminder, our $150mm preferred stock matures in February 2013." *Id.*

- "The Company has an obligation to make every reasonable effort to redeem the security at maturity and our drag right kicks in after 9 months if we are not redeemed in part (50%) or 18 months if we are not redeemed in full." *Id.*

- "Our ability to retire or partially repay the preferred in advance of maturity is limited given current shareholder dynamics." *Id.*

- "With this timetable in mind, the Company has engaged Jefferies to explore strategic alternatives." *Id.*

- "We would expect to selectively approach strategic buyers about the monetization business as well as the whole company." *Id.*

- "[W]e are likely to wait until early 2012 to make formal approaches to interested parties." *Id.*

- "A sale of the monetization assets would likely result in the Company having a cash position that would come close to paying down the preferred and a retained vertical market asset with ~$5mm of post corporate EBITDA and a positive growth profile." *Id.*

In his self-evaluation for Oak Hill's managing partners, Morse confirmed the plan for Oversee: "We have repaid all debt and are building up a cash balance, with an end-game of paying back our preferred when it matures in February 2013." JX 1032 at 3.

In November 2011, Oak Hill's partners divided the firm's portfolio companies into four categories, each with a different targeted outcome:

- "Turn Around – Maximize capital return in 12–18 months,"

- "Turn Around – Build for larger value creation,"

34

- "Maximize monetization in the next 12–18 months," and

- "Max ROI over 18–60 months." JX 1026 at 2.

The partners assigned the Company to the category of "Maximize capital return in 12–18 months." *Id.*; *see* Pade Tr. 498–502.

After making these assignments, the Oak Hill partners tasked a team with reporting back in December 2011 on how the firm could achieve these outcomes. *See* JX 1029 at 1–2. The December presentation confirmed Oversee as a target for a near-term return of capital, with "a full or partial 2012–13 exit." JX 1038 at 9, 11. Oversee was also placed on a newly created "Focus List," which identified portfolio companies "deemed to be meaningfully underperforming." *See id.* at 8, 13. The deal teams for those companies were required to present the partners with a detailed roadmap identifying "how we intend to fix the situation and ultimately maximize the realized value from our investment." *Id.* at 8.

The December 2011 presentation explained why Oak Hill needed to achieve near-term realizations: the firm was planning on raising its next fund, and it wanted its distributions to paid in capital to look good.

- "While determining the <u>sufficient conditions</u> for the launch of a successful OCHP IV <u>is an art, not science</u>, the IR team did provide us with the consensus view of LPs, GPs and Placement Agents that a <u>necessary condition</u> is a significant return of capital to investors." *Id.* at 9.

- "The consensus view is that a <u>DPI of 1.00 for OHCP II and 0.35 for OHCP III</u> are necessary conditions for a successful fundraise." *Id.*

Later in December, Morse reported to Oak Hill's managing partner that the Company's performance and the anticipated sale of the Aftermarket and Registrar businesses "will put

35

us in a position to work through our liquidity options when we return in the new year . . . ." JX 1049.

In December 2011, Pourzanjani resigned from the Board. JX 1046 at 2. Oak Hill decided to promote Morrow and Domeyer to the positions of co-CEOs, effective at year-end. JX 1049.

## I.     Oak Hill Directs Management To Maximize Cash.

By year-end 2011, Oversee's cash reserves had increased to $23 million, spurred by the Operating Committee's deep cuts in expenses. JX 1647 at 6. In late January 2012, the Company completed the sale of its Aftermarket and Registrar businesses, yielding more than $15 million in proceeds. JX 1126 at 7.

On January 9, 2012, Pade told Jefferies that the Company soon would have $40 million cash and that it was "**[i]mperative that they return some capital before $150m preferred matures 13 months from now; top priority.**" JX 1066. Pade therefore wanted "to restart conversations with [Jefferies] in early February on how best to monetize the asset." *Id.*

Pade said the same thing on January 16, 2012, when he met with the members of the Operating Committee. Pade told Morrow and Murray that "it's about the cash right now and the goal for Oak Hill at this point is get the $150MM investment back." JX 1079; Morrow Tr. 260–67. He also indicated that the Company "should sell the monetization business in 2012 given that here's no clear connection between the business units and it's a 'melting ice cream cone.'" JX 1079. For the Company as a whole, Pade wanted to "get the EBITDA plan for 2012 to $20MM." *Id.* For Vertical Markets, he wanted to grow the

36

business "to around $12MM in EBITDA" so it could be sold for around $100 million. *Id.* Morrow thought it was "clear" that Oak Hill "wants to collect the cash vs go for a bigger growth strategy." *Id.*; *see* Morrow 260–67; *see also* JX 1069 (Pade commenting that "we [Oak Hill] have had our fill and then some of 'internet performance (or lack thereof) marketing' plays"). Pade gave a softer message about the Domain Monetization business to Domeyer, who was in charge of it and wanted to invest in it, and Domeyer told Morrow that she did not think Oak Hill had ruled that out. *See* JX 1079. Privately, however, she recognized that Oak Hill was "fully intending to sell the biz area I'm responsible for." JX 1083.

Inside Oak Hill, the message was the same. On January 24, 2012, Morse sent Oak Hill's managing partner a "one-pager" on Oversee identifying the "must-do" list for 2012. JX 1090 at 1. The first goal for 2012 was to "[s]ell the aftermarket / registrar business." *Id.* at 6. The second was "[p]artial or complete asset sales to raise cash to repay the Oak Hill preferred stock prior to maturity in Feb 2013." *Id.*

On February 3, 2012, Morse explained to Morrow why Oak Hill was focused on cash. Morse told Morrow that Oak Hill was "[s]tarting fund raising in one year" and that "[s]elling monetization business and get some cash would be helpful to portfolio/fund." JX 1107; *see* Morrow Tr. 271–77. Morse believed that "[i]f we can't get the Monetization business to grow then we should sell it." JX 1107. Morse thought a buyer would pay around $80 million, which would give Oversee "around $120MM in cash plus a growth story with [Vertical Markets]." *Id.* Morse thought Domeyer needed to understand that if they sold Domain Monetization, it did not mean that she would be fired. *Id.*

37

On February 6, 2012, the Operating Committee provided Oak Hill with a proposed business plan for 2012 (the "2012 Plan"). It contemplated retaining all $38 million in cash plus all projected 2012 earnings to amass $55 million by year end. JX 1111 at 3. Realizing how this might look to Oversee's employees, Morrow suggested that Murray should

> explain our relationship with Oak Hill. I think some staff see that we made $23MM in EBITDA and we have $20MM+ in cash on the balance sheet and they don't understand why we need to cut SG&A or run lean. They obviously don't understand the dynamic between our investors and our cash/EBITDA and expectation for ROI.

JX 1089. Although Morrow told her, "I know it's basic," Murray claimed at trial not to understand what he meant. *Id.*; *see* Murray Tr. 1037–38.

On February 22, 2012, Greene recognized that Oak Hill's insistence on accumulating cash for an upcoming redemption could create a conflict of interest, and he contacted Hogan Lovells and Potter Anderson & Corroon LLP to discuss forming a "liquidity special committee." JX 1124; *see* Greene Tr. 1970. The next day, management presented the 2012 Plan to the Board. JX 1126. Immediately before the meeting, Oak Hill General Counsel reminded Morse and Scott about what "[y]ou guys know" by re-circulating Wilson Sonsini's 2011 memorandum about the Preferred Stock. JX 1134.

In charting a path to a year-end cash balance of $55 million, the 2012 Plan was unlike any prior plan. *See*, *e.g.,* JX 658 (2011 Plan); JX 472 (2010 Plan). The Company had always used its earnings for investment and acquisitions. It rarely had a cash balance greater than $15 million. JX 472 at 18; *see also* JX 53 at 4; JX 187 at 4; JX 465 at 4; JX 626 at 4; JX 1058 at 4. Where the 2011 Plan earmarked $42 million for acquisitions, the 2012 Plan did not include any budget for acquisitions. *Compare* JX 658 at 22, *with* JX 1126

38

at 38. Where the 2011 Plan contained three-year forward-looking projections, the 2012 Plan did not contain any projections. *Compare* JX 658 at 3–6, *with* JX 1126; *see also* Ng Tr. 697. The Board approved the 2012 Plan. The Board did not establish a "liquidity special committee." JX 1126. The defendants claimed not to recall any discussion about how to spend the Company's large and growing cash balance. *See* Scott Tr. 879–82; Greene Tr. 1972; Morrow Tr. 282–83; Morgan Tr. 1633–35; Jarus Tr. 1824; Pade Tr. 510; Ng Tr. 696.

At the end of February meeting, the Board made Domeyer the Company's sole CEO. JX 1130 at 3. The Board terminated Morrow, who had been the biggest champion of investing in the Vertical Markets business and whose joint promotion with Domeyer to co-CEO had been announced just one month earlier. *See* JX 1096. Given Oversee's status as a "Focus List" company, Morse promptly reported on the development to Oak Hill's managing partner. *See* JX 1132.

## J.    Oak Hill Pushes Alternatives To Generate More Liquidity.

In March 2012, the management team and Oak Hill met with Jefferies. When briefing Jefferies on management's plans in advance of the meeting, Domeyer recommended that the team "talk about both [Vertical Markets] and [Domain Monetization] equally" because Oak Hill "seems to have a preference here to sell one to raise cash for a redemption and then take a flyer on the other as potential upside." JX 1122. Jefferies recommended conducting a broad market canvas if a decision was made to sell either business. *See* JX 1150 at 12. At the beginning of April, Greene provided Pade with a waterfall analysis showing the amounts payable to stockholders and other claimants

39

"upon a sale of the company." JX 1161. Management quietly met with Sedo, the most likely buyer of the Domain Monetization business. *See* JX 1164.

At its meeting in May 2012, the Board directed management to "explore whether there would be any potential financing from such lenders to pay for a portion of the redemption amount." JX 1185 at 3; *see* Murray Tr. 1038. On May 2, Pade and Ng, acting as the Compensation Committee, officially approved the bonus agreements for Domeyer, Murray, and Greene. JX 1284; JX 1187.

In its May 2012 presentation to the firm's partners, the Oak Hill deal team reported that "[o]ur goal is to return capital on the preferred investment as soon as feasible without impairing the value potential to the common stock (of which we hold 54%)." JX 1191 at 2. The deal team noted that "[t]he company must use 'legally available funds' at that time to make a partial redemption of our security," and that "[c]ash on hand, plus potential borrowings at 1.0x-2.0x EBITDA could result in ~$75-$100 mm of proceeds for [Fund III] in early 2013." *Id.* The deal team reported that Jefferies did not believe that there was a likely buyer for the whole company; instead, both Jefferies and the deal team believed "that value would be maximized by seeking the best individual buyer of the individual assets of the company." *Id.* The deal team reported that Oversee was "in preliminary discussions with Sedo" regarding the Domain Monetization business. *Id.*

The May 2012 presentation to the Oak Hill partners outlined some of the steps that the deal team already had taken to prepare for a redemption.

- "Current and former management have incentive plans that would generate proceeds to them (from the company) in the event of full or some partial repayments of the preferred." *Id.* at 12.

- "Management and the independent directors (Allen Morgan and Scott Jarus) recognize the legal rights of the preferred, and this topic was discussed at the most recent Board meeting." *Id.*

- "Additional divestitures over the course of the year could increase the amount available to redeem the preferred in 2013." *Id.*

The deal team cautioned that it was "not simply selling assets in order to increase cash for redemption," but only when the value of the sale exceeded the value to the business. *Id.* The deal team reported that the Company planned to invest in its travel and retail verticals, evaluate its finance vertical, and manage the Domain Monetization business for cash while attempting to sell the third-party business. *Id.* at 11. The deal team explained that Oak Hill's ability to achieve "a full exit of our common stock position will depend on the ability to realize fair/full value for each business line." *Id.* at 15.

The Oak Hill deal team also warned the firm's partners about possible litigation over the redemption:

> Co-founder Fred Hsu continues to own 26% of the common stock and is already suing the company and the Board for a perceived failure to maximize value for his common shares. Despite proper procedures, he may choose to take issue with any payment to the Preferred. . . . [W]e and the company will be certain to take all appropriate steps (and document them) as this progresses.

*Id.* at 12.

On August 1, 2012, Murray and Domeyer met at Oak Hill's offices with the three Oak Hill directors (Pade, Morse, and Scott), another Oak Hill Partner (Stratton Heath), and representatives of Bank of America. JX 1219. During the meeting, they discussed whether Bank of America would provide financing that could support a redemption in the amount of $80 million. JX 1248 at 13; Murray Tr. 1042–43.

41

## K.  The First Committee

During its meeting on August 21, 2012, the Board established a special committee "to address certain issues relating to the potential redemption of the Corporation's Series A Preferred Stock." JX 1270 at 2 (the "First Committee"). The members of the First Committee were Morgan and Jarus, with Morgan serving as chair. This was the first of three occasions on which Morgan and Jarus were empowered as a special committee.

Morgan was the consummate Silicon Valley insider. He started as a corporate lawyer at Wilson Sonsini, Oak Hill's long-time counsel. Morgan Dep. 14–15. In 1999, he transformed himself into a "Start-up Sherpa," a role in which he regularly works with Silicon Valley startups, serves as a director, and helps navigate the fundraising process. Morgan Tr. 1536–37, 1610; *see* JX 2480; *see also* JX 2209 at 56–61.

Pade recruited Morgan to the Board. Morgan Tr. 1614. Over the years, Morgan and Oak Hill had exchanged favors and shared business opportunities. Morgan Tr. 1612–13, 1618–20, 1667–68; JX 1387. Morgan and Pade also had longstanding personal and professional connections. *See* Pade Tr. 364; Morgan Tr. 1613–14; JX 1387. Their families had vacationed together at Pade's vacation home in Montana, and their children had attended the same school. Morgan Tr. 1615–16; JX 1747. Before this litigation, they socialized regularly. Morgan Tr. 1616; Morgan Dep. 305.

As counsel, the First Committee hired longtime Company counsel Hogan Lovells and Potter Anderson. As its financial advisor, the First Committee hired David Weir, who did business through a sole proprietorship called Spring Creek Advisors. Morgan Tr. 1652. The First Committee hired Weir based on Morgan's recommendation and without

considering other firms. Morgan and Weir had invested together in various companies, and they had pitched Oak Hill on one of their companies. JX 504; Morgan Tr. 1653–54.

The form of the resolution creating the First Committee gave it the "exclusive power and authority" over all aspects of the redemption process, including whether to sell any of the Company's businesses and whether to use any of the Company's cash for a redemption. JX 1270 at 6. Contrary to this broad mandate, Morgan and Jarus understood their job to be limited to determining the amount of funds that could be paid out to Oak Hill; they did not understand their role to be consider alternative uses of the Company's cash. Jarus Tr. 1830–31; Jarus Dep. 177–79. Morgan and Jarus did not perceive Oak Hill's interests in maximizing the size of its redemption payment as adverse to the interests of the Company and its common stockholders. Morgan Tr. 1668–69, 1672–73, 1703; Jarus Tr. 1830–31.

### 1. The Planned Redemption Of $75 Million

The First Committee charged Domeyer, Murray, and Greene with creating a redemption proposal for Oak Hill. On September 10, 2012, Greene provided Morgan and Jarus with copies of their bonus agreements, noting that they would provide for cash payments "to the extent that proceeds received [by Oak Hill] from a change of control or liquidity event are in excess of $75 million." JX 1286. Domeyer would receive 2% of any proceeds above $75 million, Murray would receive 1.5%, and Greene would receive 1%. *Id.* Before receiving Greene's email, Morgan and Jarus did not know about the agreements. Morgan Tr. 1666–67; Jarus Tr. 1833.

Morgan and Jarus saw nothing wrong with letting the conflicted management team take the lead in creating a proposal for Oak Hill. Throughout the resulting process,

management and representatives of Oak Hill worked hand-in-glove on redemption-related issues. *See, e.g.,* JX 2519; JX 1838; JX 1839; Murray Tr. 1047–51, 1056–60, 1069–70. Management and Oak Hill communicated about the amount of funds legally available for redemption. Morgan Tr. 1672, 1675–76; JX 1519. Management even provided Oak Hill in advance with sensitive documents prepared at the First Committee's request, including financial projections prepared at the First Committee's request and ranges of possible redemption amounts developed for negotiation purposes. Morgan Tr. 1680–82; Jarus Tr. 1825–37, 1841–44; JX 1518; JX 2525.

The management team's opening proposal called for paying $75 million to Oak Hill, with $40 million from the Company and another $35 million in financing. JX 1285; JX 1287 at 3. A redemption of that size would mean that any additional proceeds for Oak Hill would trigger management's bonus payouts. The opening proposal hit the low-end of the range of $75 to $100 million that Oak Hill had targeted in its internal presentations, and it was just $5 million below the $80 million figure discussed before the First Committee was formed.

After receiving management's proposal, the First Committee and its advisors gathered extensive information about the Company, its financial position, its business plan, and its ability to raise debt. During this same period, management was developing a set of four-year forecasts to provide to the Company's lenders in connection with the extension of its credit agreement. The forecasts contemplated significant growth in the Vertical Markets business as a result of a series of new website initiatives. *See* JX 1333; JX 1335 at

44

2; JX 1336. After receiving indicative terms from the Company's lenders, management reaffirmed its proposed redemption in the amount of $75 million. *See* JX 1349.

On October 29, 2012, the First Committee made its opening proposal to Oak Hill. Following management's recommendation, the Company would redeem shares of Preferred Stock in the amount of $75 million, with $40 million from the Company's balance sheet and $35 million from an anticipated credit agreement. In return, Oak Hill would agree (i) to defer the date for any further redemption until 180 days after the expiration of the Company's three-year credit agreement (approximately May 2016) and (ii) defer the exercise of the Drag-Along Right until February 12, 2018. *See* JX 1372 at 5.

On November 5, 2012, the First Committee held a negotiating session with Oak Hill. On the Friday before the meeting, Morgan had a backchannel conversation with Pade. *See* JX 1378. During the call, Pade previewed with Morgan certain additional demands that Oak Hill planned to make, including (i) a commitment to redeem additional shares if the Company sold its Domain Monetization business, (ii) a payment-in-kind ("PIK") dividend of 12%, and (iii) the ability to exercise the Drag-Along Right beginning in August 2014. *See* JX 1385. The Company's commitment to make additional redemptions was important to Oak Hill, because in mid-October, Rook Media had made a non-binding offer to acquire the Domain Monetization business for $70–$100 million. *See* JX 1393. During the negotiation session, Pade made the demands that he had previewed. *See* JX 1386 at 2.

On the morning of the November 5 negotiation session, Morgan asked Pade to do him a favor by meeting with a colleague. *See* JX 1387 (Morgan describing Pade as "an old

45

friend"). Two days later, Pade agreed and had another backchannel call with Morgan "re the [November 5] meeting on Monday". JX 1392.

The First Committee analyzed Oak Hill's proposal with the assistance of Weir and Company management. *See* JX 1394; JX 1395; JX 1403. While the First Committee was formulating its counterproposal, Pade contacted Morgan about having another backchannel discussion. *See* JX 1406; JX 1412.

On November 21, 2012, the First Committee agreed to Oak Hill's request that all proceeds of any additional sales of assets would be used for further redemptions. The First Committee also offered Oak Hill a 2% PIK dividend. *See* JX 1422 at 5, 6. Oak Hill countered by increasing its ask. In addition to a PIK dividend of 4–5%, Oak Hill asked the Company to commit to future redemptions if its free cash flow exceeded an agreed-upon threshold. *See* JX 1429 at 2. During a board meeting on November 29, the Oak Hill directors and the First Committee reached a tentative deal on Oak Hill's terms. *See* JX 1431; JX 1432; JX 1434; JX 1435; JX 1440. Management was tasked with identifying the threshold for future redemptions. *See* JX 1439. The deal fell apart when the Company's banks would not provide financing for a redemption because of concern that Hsu might prevail in his pending litigation with the Company. *See* JX 1445; JX 1446; JX 1448.

In December 2012, while the redemption discussions were proceeding, Domeyer reported to the Board that "Oak Hill has approved the [2013] operating plan[,]" which the Board would "formally approve for minute purposes" at its next meeting. JX 1458. The 2013 Plan would play a major role in determining how much additional funds were legally available for future redemptions. *See* Domeyer Tr. 1379–80; JX 1458.

## 2. The Planned Redemption Of $50 Million

In January 2013, the banks indicated a willingness to a $15 million credit facility. *See* JX 1478. The Company had approximately $51.5 million in cash at year end, and management proposed using $50 million to redeem Preferred Stock from Oak Hill. JX 1485. During a meeting on January 25, 2013, the First Committee asked Murray to prepare a set of projections that would include a redemption of $50 million to determine how it would affect the Company's working capital needs. JX 1498 at 3. Murray ran the cash analysis by Oak Hill before providing it to the First Committee. *See* JX 1518. This was consistent with her general practice of clearing all materials through Oak Hill. *See* JX 2519; JX 2520; JX 2521; JX 2522; JX 2523; JX 2524; JX 2525.

After spending a full day with management and discussing a variety of topics including the redemption, Pade told Morgan and Jarus on February 1, 2013, that Oak Hill would exercise the Redemption Right in full on February 13. JX 1514. Pade proposed that in return for a $50 million redemption, Oak Hill would forebear from seeking any further redemptions before year-end 2013, terminable in Oak Hill's sole discretion with thirty-days' notice. *Id.* The First Committee and its advisors developed a limited counterproposal, but management shared it with Scott, who indicated that it "was not likely to be received well" by Oak Hill. JX 1529. Potter Anderson advised that if Oak Hill did not receive the counteroffer well, then Oak Hill might deliver a redemption without offering any forbearance, at which point "the Company likely would have to use at least all the cash on its books for the redemption and probably would also need to take at least some steps to generate additional legally available funds from other sources." JX 1531.

47

### 3. The Actual Redemption Of $45 Million

The banks were not comfortable with Oak Hill's terminable forbearance proposal; they wanted some form of side letter that would restrain Oak Hill or otherwise protect their interests. Rather than negotiating further with the banks, Oak Hill proposed a redemption using only the Company's cash.

On February 11, 2013, Oak Hill's counsel told the First Committee's counsel that "it was critically important to [Oak Hill] that it receive a redemption of $45 million" by March 15. JX 1543. Oak Hill's counsel indicated that Oak Hill wanted to proceed with a redemption without a bank loan, would accept a redemption of $45 million, and would grant its proposed forbearance. *Id.*

The First Committee and its counsel did not ask what was driving Oak Hill's request. *See* Morgan Tr. 1687–88; Jarus Dep. 310–13; Gilligan Dep. 374–75. Internal Oak Hill documents show at the time, Oak Hill's managing partner was planning a "Year-in-Review" presentation for the firm's annual meeting with the limited partners. JX 1580 at 2. The presentation included a section on the "Path to OHCP IV," and Oak Hill's investor relations department thought that distributions from Oversee and two other portfolio companies could be used to "round up" the ratio of distributions to paid in capital so that Oak Hill could announce that "we have met our previously stated goal of 0.30x" for Fund III.[9]

---

[9] *Id.* at 1, 23; Crandall Dep. 165–66. The final presentation did not round up the number, likely because as of April 15, the calculation from Fund III stood at .23x, not the anticipated figure of .26x. JX 1615 at 36. Oak Hill's December 2012 plan for achieving

The First Committee agreed to Oak Hill's number. *See* JX 1545; JX 1546; JX 1547. On February 13, 2012, Oak Hill sent a request for a full redemption of its Preferred Stock and its proposed forbearance agreement. JX 1554. Greene proposed negotiating with Oak Hill over its terms, but Jarus waived him off, telling him that the Company did not have "much, if any, leverage in a negotiation with [Oak Hill]." JX 1555; *accord* JX 1556 ("Within the context of this matter, there is really no bargaining leverage that the Company could employ."). The First Committee recommended that the Board accept the redemption and forbearance agreement. *See* JX 1558. On February 27, 2012, the Board approved both. Domeyer, Morgan, Jarus, and Ng voted in favor. Pade abstained. Morse and Scott did not attend. *See* JX 1575 at 1, 2. Management anticipated that Oak Hill planned to sell off the rest of the Company in pieces. *See* JX 1576 at 1.

At the beginning of March 2012, the Oak Hill deal team reported to the Oak Hill partners on the $45 million redemption and Oak Hill's prospects going forward.

- "Oversee remains in a state of modest EBITDA decline. Lower revenue and gross profit from the Monetization business have not been offset by sufficient growth in Vertical Markets to return to growing EBITDA." JX 1577 at 2.

- "While Monetization declined less quickly than expected in 2012, we see limited strategic potential for the business going forward and continue to pursue opportunities to sell the division." *Id.*

- "All three Vertical Markets businesses need to continue to develop their business models to become more value-added players in their respective industries. Value creation here will be a function of the differentiation and growth of each business as much as or more than the growth in current EBITDA . . . ." *Id.*

---

realizations had also contemplated using a distribution from Oversee to meet Oak Hill's goal. *See* JX 1038 at 11.

- "By year-end 2013 and after giving effect to the partial redemption in March, Oversee's forecast cash balance is $19.6 mm." *Id.*

- "We would recommend pursuing efforts to sell Monetization while allowing Oversee to continue to invest modestly into the Vertical Markets businesses." *Id.*; *see id.* at 10.

The deal team expected that given the Company's cash profile, "an additional $15 million may be available for redemption at year-end." *Id.* at 13.

On March 18, 2013, the Company paid Oak Hill $45 million to redeem shares of Preferred Stock (the "First Redemption").[10] With the completion of the First Redemption, the First Committee disbanded. *See* JX 1618.

The First Redemption left the Company with approximately $7 million to operate. JX 1546 at 1. Domeyer feared that the Company's lack of financial resources would limit her ability to pursue acquisitions, and she wanted a line of credit that would give the Company that flexibility. JX 1549 at 1. For accounting purposes, however, Oak Hill's exercise of the Redemption Right in full, combined with a forbearance agreement terminable on thirty-days' notice, caused the Preferred Stock to be classified as a current liability, and the banks treated the Company as balance-sheet insolvent. *See* JX 1640; JX 1647 at 12–13; JX 1911 at 6. As a result, the Company would not be able to obtain a credit line until the overhang from the Preferred Stock was addressed. Jarus told Domeyer to

---

[10] Kupietzky's employment agreement called for him to receive a bonus if shares of Preferred Stock were redeemed. He received $632,813, or approximately 1.4% of the redemption amount. Murray, Greene, and Domeyer did not receive a bonus, because their agreements required a redemption of at least $75 million to trigger their payments.

continue to explore acquisitions, and that if management found one that was attractive, then they could make an argument for the additional funding. *See* JX 1565; *see also* JX 1546.

Greene also believed that M&A for 2013 would be "constrained by our 2013 EBITDA Plan." JX 1581 at 1. He acknowledged that management "can of course always have a discussion with the Board if we see a great acquisition and say hey we need to absorb say $250K of expense in 2013," but he cautioned that "we shouldn't give the rest of the team the impression that we can absorb a bunch of cost." *Id.*

Hsu learned of the March Redemption on May 23, 2013, when Greene emailed him the Company's audited financial statements for 2012. Hsu was shocked. He emailed Greene:

> Well this is a surprise. Our "growth company" emptying its coffers to Oak Hill through redemption? How is this supposed to instill shareholder confidence? On April 5[th] I asked you if there were any material corporate transactions and to get this to me within a reasonable 5-7 days. How is it this is the first time I'm hearing of this?

JX 1649. Greene replied: "I believe that you have been aware of the redemption right since Oak [Hill] made their investment back in 2008 . . . . In February they provided a redemption notice pursuant to the charter and the company complied with its obligation to redeem the shares that it could." *Id.* Greene's reply obscured the lengthy engagement between the Company and Oak Hill that led up to the formal exercise of the Redemption Right.

## L. Events After The First Redemption

During the final stages of the discussions over the First Redemption, Rook Media approached the Company about buying the Monetization Business. Platinum Equity also had expressed interest. Consistent with the Oak Hill deal team's intent to "[p]ursue all

51

possible avenues for a sale of the [Monetization] business," senior management and Oak Hill spent the next two months "pursuing these options aggressively." JX 1577 at 10. Senior management and Oak Hill also devoted considerable effort to convincing the Company's outside auditors that Oak Hill's redemption notice and terminable forbearance agreement did not warrant a going-concern qualification on the Company's financial statements. *See, e.g.*, JX 1626; JX 1640.

Shortly after the First Redemption and at Morse's suggestion, Domeyer spent a day with Jeffrey Epstein, an outside advisor to Oak Hill, to identify strategies for Oversee. The first option was "sell everything to Platinum." JX 1591 at 2. The second was "sell monetization to Platinum; keep verticals; grow slowly to become Internet Brands," a leader in the vertical markets space. *Id.* The third was to boost the second with "$50 million in capital to grow faster." *Id.* As things stood, Oversee lacked the "$50 million in capital to grow faster" because of the large redemption payment to Oak Hill. The Company also could not access debt capital because of Oak Hill's exercise of the Redemption Right and the terminable forbearance agreement. The Company did look at some acquisitions during the first part of 2013, but not in an organized or serious way. *See, e.g.*, JX 1630; JX 1636; JX 1641.

The sentiment at Oak Hill changed in May 2013, when Platinum Equity indicated that it would not buy the Domain Monetization business. *See* JX 1653. Needing a new strategy, the Oak Hill deal team met with Domeyer and re-focused on possible acquisitions, particularly for the Vertical Markets business. *See* JX 1655 at 2–3. Responding to Oak Hill's shift in emphasis, the senior executives at the Company began trying to ramp up the

Company's acquisition pipeline. *See* JX 1671; *see also* JX 1657 at 25 (listing acquisitions under consideration); JX 1662. The June 2013 board materials were the first time since Kupietzky's removal that the presentations included a page listing possible acquisitions; nine of the eleven options were only in the "initial" phase. JX 1657 at 25; JX 1656 at 2. The Oak Hill deal team also began reviewing more acquisition prospects and forwarding them for management to review. *See* JX 1658; JX 1661; JX 1688. Oak Hill even considered a whole-company merger between Oversee and CPX that Oak Hill believed could support a leveraged dividend. *See* JX 1676 at 1 (Pade: "I told them that this would be a leveraged deal [and] that Oak Hill would be looking to take some money out."); JX 1681 at 1 (Oak Hill email attaching analysis "focused on how much cash we would be able to take off the table"). Oak Hill projected being able to pull out $30 million in cash. *See* JX 1686 at 1. CPX would later decline to proceed. JX 1727.

In September 2013, Morse left Oak Hill and resigned from the Board. *See* JX 1701; JX 1709. This left Pade and Scott as the Oak Hill representatives. Morse's seat was left vacant.

Management and Oak Hill continued to look at acquisitions, and the number of opportunities that Oak Hill and management examined contrasted with the relative dearth of opportunities they looked at in the second half of 2011 and during 2012. The process, however, was haphazard. By September 2013, Jarus perceived that the management team wanted direction from Oak Hill, and he told his fellow directors that they needed to meet to "discuss and establish a strategic direction for the Company." JX 1720 at 1–2. The discussion never occurred. Jarus Dep. 328–32.

53

Instead, in September 2013, the Company received an expression of interest in the Domain Monetization business at a price of $33 million. Oak Hill and Oversee management reached out to other parties and received a second indication of interest. *See* JX 1782 at 18 (summarizing contacts). The Oak Hill deal team reported to the partners that "[w]hile these indications are at distressed pricing levels (3-4x forward EBITDA), they may represent a premium to the NPV of the 'status quo' forecasts" given negative financial trends. JX 1751 at 2. For the Vertical Markets business, the Oak Hill deal team reported that "both the travel and retail lead generation businesses have missed [their budgets] by a material amount." *Id.* Despite looking at many acquisitions, the Company had not made any, and the Oak Hill deal team projected that the Company would end the year with approximately $18 million in cash. *Id.* The Oak Hill deal team reported that during 2014, management planned to invest $1.5 million in a new travel website called WanderWe, but that was "the only budgeted new initiative of size in 2014." *Id.* at 5.

As with the 2013 Plan, Oak Hill reviewed and pre-approved management's 2014 Plan before it was disseminated to the Board. JX 1744. The 2014 Plan proposed that the Company pursue *venture capital financing* to fund WanderWe, rather than using Oversee's cash. *See* JX 1745 at 28. The plan reduced the Company's airport parking sites to a "Skeleton Team . . . in order to increase profitability . . . ." *Id.* at 45. The Company's other "new initiative," a site called RebateCove, was "paused." *Id.* at 70.

## M.    The Second Committee

In January 2014, the Company completed its first acquisition since Kupietzky's departure, buying the assets of Crash City Guides for $85,000 to provide content for

WanderWe. The non-Oak Hill directors were informed just before the press release was issued. JX 1761. Domeyer also informed the non-Oak Hill directors that, "[w]ith Oak Hill's approval, we have . . . negotiated" a letter of intent to sell the Domain Monetization business to Rook Media for $42.5 million. JX 1764.

Management focused on closing the sale of the Domain Monetization business. *See* JX 1767 at 1. Domeyer, Murray, and Greene made a point of reviewing their bonus agreements. JX 1768. As the deal progressed, Rook Media reduced its price to $40 million. JX 1779. If the full $40 million went to Oak Hill, then Oak Hill's total proceeds would reach $85 million, clearing the $75 million hurdle for management to receive their bonuses.

As the sale of the Domain Monetization business approached fruition, the Board formed a new special committee, again comprising Morgan and Jarus, but this time with Jarus as chair (the "Second Committee"). *See* JX 1790. Its sole mandate was to consider the fairness of the sale price. Morgan Tr. 1696–1700; JX 1790. The Second Committee paid $20,000 for a fairness opinion from Cronkite & Kissell LLC, the firm that prepared the Company's Rule 409A valuations for issuing stock options. *See* JX 1803; JX 1810.

The Second Committee recommended that the Board approve the sale of the Domain Monetization business. *See* JX 1852. Before doing so, management represented that no one had spoken with Oak Hill about uses of the proceeds. JX 1836 at 3. That was theater, because everyone knew that the proceeds would likely be swept out in another redemption. Jarus Tr. 1848–49. Management had in fact informed both Cronkite & Kissell and its auditors that "[t]he Company is expecting to sell off its various business units in

55

order to satisfy its redemption liability." JX 1839; *see* Cronkite Dep. 175–76; *see also* JX 1838 at 1.

On April 14, 2014, the Board approved the sale. JX 1851. In an internal email, Murray expressed her concern about the fate of Oversee, writing, "I am not sure absent Monetization, the Company is a going concern." JX 1853.

## N.      The Company After The Sale Of Domain Monetization

The sale of the Domain Monetization business left the Company with only its Vertical Markets business. For April 2014, that business had generated $1.4 million in revenue, $822,000 in gross profit, and negative $318,000 of EBITDA. JX 1869 at 6. Year to date, it had generated $5.9 million in revenue, $3.2 million in gross profit, and negative $1.5 million in EBITDA. *Id.* Revenue from the travel vertical had declined steadily over the preceding two years. *See id.* at 8–9. Revenue from the consumer finance vertical had fluctuated month-to-month while remaining basically flat. *See id.* at 11. Revenue from the retail vertical had declined significantly. *Id.* at 16.

Since the First Redemption, Oversee had not made any significant acquisitions, nor had it invested meaningfully in its business. With the sale of the Domain Monetization business, the Company's cash balance reached $53.7 million. *Id.* at 4.

In May 2014, the Board approved a reduction in force that included the anticipated departures of Murray and Greene. *See* JX 1877 at 2–3. The Board also approved management's proposal to restructure Oversee's three Vertical Markets businesses as separate subsidiaries, with each to be run on an entrepreneurial basis with its own incentive plan. *See id.*; JX 1876 at 11–13; JX 1886; JX 1889. The three senior managers created

56

spreadsheets calculating the bonuses they would seek from Oak Hill for closing the sale of the Domain Monetization business and delivering further redemption proceeds to Oak Hill. *See* JX 1872; JX 1878; JX 1884; JX 1888.

## O.     The Third Committee

In June 2014, the Board formed a third special committee, again comprising Morgan and Jarus (the "Third Committee"). JX 1887. Its sole mandate was to determine how much cash was legally available for a second redemption. *Id.* at 8. They again relied on Weir as their financial advisor. JX 1908. Oak Hill was "anxious for [the Third Committee] to get the redemption recommendation completed ASAP." JX 1914.

Management had not made any plans to use the funds from the sale of the Domain Monetization business, and identifying uses for the funds was not within the Third Committee's mandate. Morgan Tr. 1703; Jarus Tr. 1864. To assess the amount of funds that would be legally available for redemption, the Third Committee focused on how much money was needed to run the existing Vertical Markets business until it could generate positive EBITDA and be self-supporting. JX 1913 at 2. The Third Committee also asked the obvious question: whether the Company should just be liquidated. *See* JX 1925 at 1; JX 1941 at 1.

The Third Committee relied on Domeyer and Murray to inform them about the Company's cash needs. Unbeknownst to the Third Committee, Murray ran all her projections by Pade and Scott at Oak Hill. *See* JX 1929; JX 1944; JX 1945; JX 1948; Murray Tr. 1069–71; *see also* JX 1939 ("Even with her leaving, she's still updating them .

57

. . ."). And Domeyer followed Oak Hill's directions when developing the Company's business plan. *Compare* JX 1941, *with* JX 1943 at 3.

Also during this period and unbeknownst to the Third Committee, Domeyer, Greene, and Murray negotiated their bonus payments with Oak Hill for completing the sale of Domain Monetization plus the projected amount that the "remaining liquidation" of Oversee would yield. JX 1895; *see* JX 1884; JX 1888; JX 1915. Also unbeknownst to the Third Committee, Murray and Greene discussed post-Oversee employment opportunities with Oak Hill. *See* Murray Tr. 1074–76; Greene Tr. 1926–27; JX 1891. In the midst of the Third Committee's work, Murray accepted an offer to become CFO of Monsoon, another Oak Hill portfolio company that later underwent a liquidation. Because the position involved a pay cut, Pade proposed that *Oversee* compensate Murray with additional severance to "make it adequately financially attractive for her to accept the position at Monsoon at an overall lower total cash comp level." JX 1865. On her last day at Oversee, Murray tipped Oak Hill about the Third Committee's forthcoming redemption proposal. JX 1948. Both Murray and Greene left the Company in August 2014. JX 1921. Greene continued as a consultant to assist the Third Committee. *See* JX 1963 at 1.

In mid-August 2014, management recommended a second redemption of $40 million. *See* JX 1952. Weir signed off with an analysis consisting of a two-sentence email saying that he "concur[ed]" with management. JX 1954. In exchange for recommending a redemption of $40 million, the Third Committee obtained Oak Hill's commitment to extend its forbearance agreement by six months, still terminable on thirty-days' notice. JX 1969; JX 1978; JX 1982; JX 1986. The Board approved the second redemption in reliance

on the Third Committee's recommendation. JX 1984. The redemption was completed on September 2 (the "Second Redemption"). PTO ¶ 90; *see* JX 1985.

**P.      The Fate Of The Remaining Business**

In October 2014, the Oak Hill deal team reported to the Oak Hill partners on the sale of the Domain Monetization business, the Second Redemption, and the prospects for the remaining business:

- "Oversee has undergone a fundamental change in 2014 with the sale of the Company's Monetization business." JX 2015 at 2.

- "Monetization represented the majority of the Oversee business (82% of 2013 EBITDA contribution)." *Id.*

- "The sale of Monetization provided Oversee with sufficient proceeds for a second redemption of the Oak Hill preferred." *Id.*

- "Oversee's remaining assets consist of their lead generation-oriented Vertical Markets properties, as well as a modest portfolio of generic domain names. The Vertical Markets businesses have continued to struggle in 2014." *Id.*

- "Oversee's near-term focus is on the stabilization of the remaining Vertical Markets properties at greater-than-break-even cash generation levels." *Id.*

- "Total company headcount is down from 97 at the start of the year to 26 today." *Id.*

- "Current annualized cash burn rate of ~$2M but expected to be zero by year end." *Id.*

- "Given the *de minimus* [sic] value achievable for any of the Vertical Markets assets today, we would recommend continuing to operate the Travel and Consumer Finance verticals, while selling the very impaired Retail vertical before year-end." *Id.*

The deal team estimated a potential exit in 2015 to 2016. *Id.* at 3.

Also in October 2014, Oversee received an unsolicited inquiry for the domain name "compare.com." Since Kupietzky's time, that domain name had been the foundation for a

59

planned expansion of the retail component of the Vertical Markets business, but it was never meaningfully pursued. Oversee sold the domain name for $2 million. *See* JX 2015 at 7; JX 2027 at 6.

In December 2014, the Company sold ShopWiki. The business had been savaged by Google, and the Company secured a price of just $600,000. JX 2035; JX 2134 at 23. The Company closed the sale quickly to secure a tax loss. *See* JX 1953; JX 1956; JX 1991; JX 2134 at 23.

The sale of ShopWiki left the Company with only its travel and consumer finance verticals. By January 2015, Pade was already thinking ahead to the possible "sale of one or both of the remaining businesses." JX 2046. The Company implemented a change-of-control bonus program to incentivize the employees, and Domeyer began talking to potential purchasers. *See* JX 2049 at 5; JX 2050 at 2; JX 2051 at 2.

In 2015, the Company had generated $5.6 million in revenue and lost $1.2 million. JX 2127 at 7, 14. ODN's auditors opined that there was "substantial doubt about the Company's ability to continue as a going concern." *Id.* at 5, 11.

In January 2016, the Company sold two of its three travel websites—Lowfares and Farespotter—for $3.75 million. *See* JX 2098 at 4. These transactions left Aboutairportparking.com as the lone remaining business in the travel vertical. During 2015, it had not met plan in any month. *See* JX 2083 at 2.

## Q. This Litigation

On December 11, 2015, Hsu received the Company's 2014 audited financial statements and learned of the Second Redemption and the sale of ShopWiki. In January

2016, he sought books and record pursuant to Section 220 of the Delaware General Corporation Law. The Company agreed to produce certain documents, including minutes of Board and committee meetings. On March 15, 2016, Hsu filed this action.

With the litigation pending, Oversee continued to operate its existing businesses, consisting of Aboutairportparking.com and the consumer finance vertical. Towards the end of 2016, Oversee started a new site called "PlanMyTrip.com," which was expected to launch in 2017. The site was an updated version of WanderWe.

In March 2017, the Company sold the consumer finance business for $550,000. JX 2164. In May 2017, Jarus and Morgan resigned from the Board. JX 2172; JX 2173. Pade, Scott, and Domeyer were its only directors. As of June 2017, Oversee had a cash balance of $13.3 million. JX 2187. Without this litigation, Oak Hill would have wound down the business and distributed the cash to pay down the Preferred Stock. *See* JX 2424 at 2.

In March 2018, Domeyer resigned from her positions with Oversee. JX 2230. In August 2018, Oversee sold Aboutairportparking.com for $485,000. JX 2267 at 3. The Company says that it continues to develop PlanMyTrip.

## II.    LEGAL ANALYSIS

By the time of post-trial briefing and argument, the plaintiff had narrowed his theories to a claim for breach of fiduciary duty against Oak Hill, its representatives on the Board (Pade, Morrow, and Scott), three of their fellow directors (Ng, Morgan, and Jarus), and four senior officers who received bonuses tied to the redemptions of the Preferred Stock (Domeyer, Murray, Greene, and Morrow). All other claims have been waived. *See*

61

*Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

A claim for breach of fiduciary duty is an equitable tort.[11] The claim has only two formal elements: (i) the existence of a fiduciary duty that the defendant owes to the plaintiff and (ii) a breach of that duty.[12]

In this case, the existence of a fiduciary duty is undisputed. Each defendant was a fiduciary who owed duties to the Company and all of its stockholders. Pade, Morse, Scott Ng, Morgan, and Jarus were corporate directors who owed duties in that capacity. Domeyer, Murray, Greene, and Morrow were officers whose duties parallel those of directors. Oak Hill was a fiduciary because it controlled Oversee, including by exercising a majority of its voting power.[13]

At the pleading stage, this court held that it would constitute self-interested conduct for Oak Hill to cause the Company to pursue a strategy of accumulating cash to maximize

---

[11] *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *54 (Del. Ch. July 12, 2010) ("A breach of fiduciary duty is easy to conceive of as an equitable tort."); *see also Restatement (Second) Torts* § 874 cmt. b (Am. L. Inst. 1979) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct . . . ."). *See generally* J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act*, 11 Del. L. Rev. 71 (2010).

[12] *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010); *accord Zrii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009) (citing *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002)).

[13] *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del. 1994) (observing that a stockholder becomes a fiduciary if it "'owns a majority interest in . . . the corporation.'") (quoting *Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987)); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006) ("Under our law, a controlling shareholder exists when a stockholder . . .

the near-term value of its Redemption Right rather than investing the cash productively for the benefit of the Company and its common stockholders. *See Frederick Hsu Living Tr. v. ODN Hldg. Corp.* (*Pleading-Stage Decision*), 2017 WL 1437308, at *36 (Del. Ch. Apr. 14, 2017). That ruling is law of the case. The first question is whether the plaintiff proved that Oak Hill pursued that strategy. If so, the second question is whether Oak Hill's self-interested conduct constituted a fiduciary wrong under the applicable standard of review.

## A. Self-Interested Conduct By Oak Hill

The plaintiff proved that Oak Hill caused the Company to accumulate cash so that the funds would be legally available and could be swept up using its Redemption Right. The actual redemption was not the critical step. The Company was obligated to use all of its legally available funds for a redemption. Consequently, once the Redemption Right ripened and Oak Hill exercised it, even a fully disinterested and independent board would be constrained in its ability to withhold funds or otherwise limit the amount of cash that Oak Hill could extract. *See ThoughtWorks*, 7 A.3d at 984, 989; *Mueller v. Kraeuter & Co.*, 25 A.2d 874, 877 (N.J. Ch. 1942). The critical step was building up the pool of funds that would be available for redemption.

If disinterested and independent directors had decided how to deploy the Company's net income, then this would be an easy case. The business judgment rule would protect the decision.

---

owns more than 50% of the voting power of a corporation . . . ."); *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) ("A shareholder is a 'controlling' one if she owns more than 50% of the voting power in a corporation . . . .").

In this case, the plaintiff proved that Oak Hill drove the decision. Oak Hill began focusing on a near-term return of capital during a partners meeting in May 2010. The "consensus" coming out of the meeting was for the deal team "to take action to realize value sooner rather than later" and to focus on "exit timing" and "monetization strategy." JX 524. The Oak Hill partners stressed the need for portfolio exits again in September 2010. JX 569. One reason the partners wanted realizations was that the firm expected to raise a new fund in 2012, and "a necessary condition" for successful fundraising "will be that we return more than the $160 million predicted in the portfolio reviews over the coming year and a half." *Id.* at 2. Oak Hill did not in fact raise a fund in 2012, but that eventuality did not retroactively change the factors that contributed to Oak Hill's actions.

The Oak Hill deal team responded. In a January 2011 presentation to Oak Hill's partners, Pade, Morse, and Scott explained that they had initiated "an overall review of Oversee's strategic direction" that included "either larger M&A or a shareholder dividend." JX 642 at 3; *see also* JX 667. In a March 2011 update to Oak Hill's partners, Pade, Morse, and Scott reported that they were "engaged in a series of actions to improve our expected outcomes," and they recommended against maintaining the "status quo" at Oversee. JX 723 at 2, 11. Elaborating, they noted the following:

- "EBITDA growth of 10-12% builds value primarily for the common equity (of which [Fund III] owns approximately half)." *Id.* at 11.

- "Oak Hill's preferred does not participate in value creation until equity values above $403 million, and with a net cash position, there is not leverage between enterprise value and equity value creation for the preferred." *Id.*

- "A transformative M&A transaction, a change to the capital structure, or a change to the growth profile would be necessary to support an extended hold period." *Id.*

To change the status quo, the deal team had embarked on a "staged action plan" that involved (i) selling the Registrar business, (ii) engaging in transformative M&A, and (iii) changing senior management. *Id.* at 2. The team identified "a dividend recap transaction" as a means of returning capital, but noted it was "best sequenced as a late-2011 event, possibly tied to the preferred maturity, absent a strategic transaction." *Id.*

Consistent with their reports, Pade, Morse, and Scott attempted to achieve a near-term return of capital by merging the Company with NameMedia and paying out a large dividend. JX 723 at 12. In May 2011, the NameMedia deal fell apart. At this point, Oak Hill looked more closely at managing the Company for profitability, generating additional cash by selling assets, and using the cash to redeem shares of Preferred Stock.

During the same period when the prospect of a deal with NameMedia was receding, the Company was suffering a second consecutive disappointing quarter. Although the Company remained profitable and generated significant EBITDA, its results had fallen short of budget and its profit margins had narrowed. Oak Hill took aggressive steps to reverse the decline and restore the Company's margins. In June 2012, Pade and Morse relieved Kupietzky of all operational responsibility, replacing him with the Operating Committee. Pade and Morse instructed the Operating Committee to make "bold" cuts in the Company's expenses to restore its gross margins.[14]

---

[14] JX 906; *see* JX 894 at 4 (indicating that Pade said to cut "millions in SG&A"); *id.* (observing that "[t]here will be some things we do that we cut that we'll regret"); *see also* JX 925 at 2 (Jefferies call report stating Murray reported that "[the Operating Committee is] presenting to the board on 8/17 a plan for 2012 . . . will likely include substantial cost

The plaintiff asserts that when taking these steps, Oak Hill had already decided to generate cash for redemptions. It is true that Oak Hill wanted to achieve a return of capital and understood the potential use of its Redemption Right, but Oak Hill had not yet settled on a specific strategy. Oak Hill worked with Jefferies to analyze different alternatives. Oak Hill also had management examine different strategies. Morrow pushed the hardest for investing in Vertical Markets to promote growth. *See* JX 889; JX 923.

Oak Hill continued to demand cuts in the Company's expenses. In September 2011, the Operating Committee implemented a layoff that terminated thirty-four employees. JX 980. In total, the cuts reduced the Company's SG&A expense from $3 million per month in 2011 to a projected SG&A expense of $1.8 million per month in 2012. JX 944 at 44.

It was sometime in the fall that the deal team decided to build up cash in anticipation of the Preferred Stock maturing in February 2013. In an October 2011 presentation to the Oak Hill partners, the deal team reported that the Company had stabilized and its business was improving *See* JX 1009 at 2. The team then explained:

- "As a reminder, our $150mm preferred stock matures in February 2013." *Id.*

- "Our ability to retire or partially repay the preferred in advance of maturity is limited given current shareholder dynamics." *Id.*

- "With this timetable in mind, the Company has engaged Jefferies to explore strategic alternatives." *Id.*

- "A sale of the monetization assets would likely result in the Company having a cash position that would come close to paying down the preferred and a retained vertical

---

cuts."); JX 954 at 2 ("[T]here is full expectation by Oakhill [sic] and the Board that we will be reducing our SGA").

market asset with ~$5mm of post corporate EBITDA and a positive growth profile." *Id.*

In his self-evaluation for Oak Hill's managing partners in November 2011, Morse confirmed the plan for Oversee: "We have repaid all debt and are building up a cash balance, with an end-game of paying back our preferred when it matures in February 2013." JX 1032 at 3.

The deal team's actions fit with Oak Hill's larger strategy. Oak Hill categorized its portfolio companies in November 2011, placing Oversee in the category of "[m]aximize capital return in 12-18 months" and *not* in the category of "[b]uild for larger value creation." JX 1026 at 4. Oversee was the only portfolio company from Fund III to be placed in the category of "[m]aximize capital return in 12-18 months." *Id.* One of Oak Hill's top priorities remained to "[d]rive sufficient realizations and investor returns to facilitate the formation of OHCP IV." JX 1038 at 4.

The expense cuts did their job. The Company ended 2011 with a cash balance of $25 million. In late January 2012, the Company sold both its Registrar and Aftermarket businesses, yielding more than $15 million in proceeds. JX 1126 at 7. On January 9, Pade told Jefferies that the Company soon would have $40 million cash and that it was "**[i]mperative that they return some capital before $150m preferred matures 13 months from now; top priority.**" JX 1066. Pade said the same thing on January 16, when he met with the members of the Operating Committee. Pade told Morrow and Murray that "it's about the cash right now and the goal for Oak Hill at this point is get the $150MM investment back." JX 1079; Morrow Tr. 260–67. Morrow thought it was "clear" that Oak

Hill "wants to collect the cash vs go for a bigger growth strategy." JX 1079; *see* Morrow Tr. 260–67; *see also* JX 1090 at 1, 6 (Morse providing Oak Hill's managing partner with a "must-do" list for 2012 identifying "[p]artial or complete asset sales to raise cash to repay the Oak Hill preferred stock prior to maturity in Feb 2013"); JX 1107 (Morse telling Morrow that Oak Hill was "[s]tarting fund raising in one year" and that "[s]elling monetization business and get some cash would be helpful to portfolio/fund").

The 2012 Plan called for keeping all $38 million in cash from the end of January, adding $17 million in projected EBITDA, and finishing the year with $55 million in cash. JX 1111 at 3. The Company in fact ended 2012 with approximately $51.5 million in cash. JX 1485. At the same meeting that it adopted the 2012 Plan, the Board terminated Morrow, who had been the main champion for investing in Vertical Markets. JX 1130 at 3.

The plaintiff again depicts Oak Hill's strategy in extreme terms, contending that after making the decision to build up a cash balance, Oak Hill no longer had any interest in growing the Company. The defendants attack that cartoonish portrayal, observing that the Board and management continued to explore strategies for growth. The defendants then go to the opposite extreme, contending that there never was any plan to accumulate cash.

As is often the case, the truth lies in between. Oak Hill's primary strategy was to maintain the Company's profit margins and generate cash. Oak Hill supported investment in the Company to the extent that it would help to maintain the Company's profit margins. In Domain Monetization, for example, the Company had to invest in its platform and acquire new domain names to maintain the cash-generating power of the business. Oak Hill also would have supported acquisitions that were immediately accretive to EBITDA,

if any could have been found, because they would have improved the Company's cash-generating capacity. Oak Hill did not support large-dollar investments in growth projects with significant up-front costs. Initiatives of that nature would increase the near-term cost structure, reduce gross margins, and hurt the Company's cash-generating capacity. *See* JX 1577 at 10; JX 1751 at 5. Murray, the CFO, acted as the enforcer of Oak Hill's directive to maintain profitability, and she watched the Company's gross margins carefully.

The evidence shows that within this framework, the Company's management team, employees, directors and even Oak Hill tried to grow the Company. But Oak Hill's priorities had consequences. From mid-2011 until March 2013, the Company did not make any significant acquisitions, nor did it make major investments in organic growth. Instead, the Company accumulated cash that was used for the First Redemption.

Oak Hill's priorities continued to have consequences after the First Redemption. Domeyer feared that a lack of financial resources would limit her ability to pursue acquisitions, and she wanted a line of credit that would give the Company that flexibility. JX 1549 at 1. Greene believed that M&A would be "constrained." JX 1581 at 1.

During mid-2013, Oak Hill and management looked at a number of possible acquisitions. Oak Hill even considered a whole-company merger between Oversee and CPX, which Oak Hill thought might support a leveraged dividend that would return $30 million to Oak Hill. *See* JX 1676; JX 1681; JX 1686. Oak Hill and management examined these options after it appeared that the Company would not be able to sell its Domain Monetization business. In September 2013, when sale talks resumed, Oak Hill and Company management re-prioritized that divestiture. The Company did not make any

major investments in organic growth or any major acquisitions in 2013. The Domain Monetization business was sold in April 2014 for $40 million. All of the proceeds were used in the Second Redemption to redeem shares of Preferred Stock.

The plaintiff thus proved that Oak Hill caused the Company to accumulate cash so that the funds would be legally available and could be swept up using its Redemption Right. Oak Hill's conduct was not so extreme that it ignored all opportunities for growth, but it did involve adopting a more conservative approach than the Company had previously followed, and that strategy reduced the extent of investment in the business.

## B.     The Possibility Of Shifting The Burden Of Proof

The plaintiff thus proved that Oak Hill engaged in self-interested conduct. When a business decision confers a non-ratable benefit on a controlling stockholder, then the standard of review for that decision is entire fairness, with the burden of proof resting on the defendants. *See Ams. Mining*, 51 A.3d at 1239. The defendants argued that the plaintiff should bear the burden of proving unfairness because of the three special committees. There are multiple reasons why the burden of proof remained with the defendants.

The first reason is procedural. The Delaware Supreme Court held in *Americas Mining* that if defendants believe the allocation of the burden of proof should shift to the plaintiff, then they must seek and obtain a pretrial determination in their favor. *Id.* at 1243. Otherwise, "the burden of persuasion will remain with the defendants throughout the trial . . . ." *Id.* The defendants did not move for summary judgment on the standard of review or allocation of burden, and so they bore the burden of proving entire fairness.

70

The second reason involves the distinction between the issues that the three special committees addressed and the decision that the plaintiff challenges. The plaintiff attacks the decision to re-orient the Company away from a strategy of reinvesting its net income in growth opportunities and towards a strategy of accumulating cash on the balance sheet. It was that strategy that created the $51.5 million in cash on the balance sheet in February 2013 and led to the First Redemption of $45 million. It was the continuation of that strategy that created the $53.7 million in cash on the balance sheet in April 2014 and led to the Second Redemption of $40 million. In each case, when it came time for the special committee to negotiate with Oak Hill, the special committee had limited leverage, because Oak Hill had a right to have its Preferred Stock redeemed out of funds legally available.

A special committee did not make the decision to re-orient the Company's business strategy. Greene spotted the issue in February 20120 and considered forming a "liquidity special committee" to approve the 2012 Plan, but that idea went nowhere. The First Committee was not formed until August 2012, long after the cash-accumulation plan was underway. Its members viewed their job as determining the amount of funds that could be used for a redemption from Oak Hill. They did not view the Company's business strategy as part of their job. The Second Committee's charge was to determine whether the price obtained for the Domain Monetization business was fair. The plaintiff does not challenge the merits of that transaction, only its status as part of an overall strategy of raising funds to support redemptions. The Third Committee's charge was to determine how much of the Company's funds to use for the Second Redemption. As with the First Committee, it did not decide on the business strategy that generated those funds.

71

The third reason is substantive. The record gives rise to sufficient concerns about the effectiveness of the special committees to prevent them from shifting the burden.

To shift the burden of proof, a special committee must be well-functioning. *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 789 (Del. Ch. 2011), *aff'd sub nom. Ams. Mining*, 51 A.3d at 1213. "Particular consideration must be given to evidence of whether the special committee was truly independent, fully informed, and had the freedom to negotiate . . . ." *Lynch*, 638 A.2d at 1120–21. In other words, it must "function in a manner which indicates that the controlling shareholder did not dictate the terms of the transaction and that the committee exercised real bargaining power at an arms-length." *Kahn v. Tremont Corp.* (*Tremont II*), 694 A.2d 422, 429 (Del. 1997) (internal quotation marks omitted).

Determining whether a committee is well-functioning is a "fact-intensive inquiry that varies from case to case." *Krasner v. Moffett*, 826 A.2d 277, 286 (Del. 2003). A Delaware court not only examines "how the committee was set up" but also "how the special committee actually negotiated the deal." *S. Peru*, 52 A.3d at 789. "[T]he actual effectiveness of the special committee" matters just as much as "the independence of the committee and the adequacy of its mandates." *Id.* at 791, 793; *accord Frank v. Elgamal*, 2014 WL 957550, at *28 (Del. Ch. Mar. 10, 2014).

Sometimes a committee process suffers from glaring flaws, such as a lack of disinterested and independent members[15] or the use of conflicted advisors.[16] Or the controller undermines the committee by engaging in "threats, coercion, or fraud"[17] or by

[15] *Lynch*, 638 A.2d at 1120 ("Particular consideration must be given to evidence of whether the special committee was truly independent . . . ."); *accord Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 642 (Del. 2014) ("[I]n 'entire fairness' cases, the defendants may shift the burden of persuasion to the plaintiff if . . . they show that the transaction was approved by a well-functioning committee of independent directors . . . ."), *overruled on other grounds*, *Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018); *see FrontFour Capital Gp. LLC v. Taube*, 2019 WL 1313408, at *25 (Del. Ch. Mar. 11, 2019) (finding committee ineffective where "majority of the members . . . lacked independence from [the controller]"); *In re Loral Space & Commc'ns Inc. Consol. Litig.*, 2008 WL 4293781, at *8 (Del. Ch. Sept. 19, 2008) (finding committee ineffective where one of two committee members had "a close personal relationship with [the controller]" and "maintained important business ties to [the controller]").

[16] *See Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1151 (Del. Ch. 2006) (finding committee ineffective where it relied on financial counsel that was effectively retained by the controller and legal counsel that "was beholden for [its] job to a board entirely dominated by [the controller], and had indeed been advising [the controller] on its approach to the tender offer from the beginning"); *In re Tele-Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727, at *10 (Del. Ch. Dec. 21, 2005, revised Jan. 10, 2006) (finding dispute of material fact as to whether committee was effective where committee "chose to use the legal and financial advisors already advising [the controller]"); *see also id.* (commenting that "[t]he effectiveness of a Special Committee often lies in the quality of the advice its members receive from their legal and financial advisors"); *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 553 (Del. Ch. 2000) (granting preliminary injunction and refusing to shift burden of proving fairness where management "abandoned the Special Committee and its independent legal and financial advisors . . . and took legal advice from the same law firm that represents [the controller]"); *cf.* William T. Allen, *Independent Directors in MBO Transactions: Are They Fact or Fantasy?*, 45 Bus. Law. 2055, 2062 (1990) ("[T]o implement the substance of an arm's-length process . . . the lawyers and the bankers [for the special committee] must be independent of management.").

[17] *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 n.38 (Del. Ch. Oct. 2, 2009); *see Lynch*, 638 A.2d at 1120 (holding that "the ability of the Committee effectively to negotiate at arm's length was compromised by Alcatel's threats to proceed with a hostile tender offer if the $15.50 price was not approved by the Committee and the Lynch board"); *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL

depriving the committee of material information.[18] But a committee can also be ineffective

because of more subtle influences, such as a network of relationships with the controller

5052214, at *13, *28 n.15 (Del. Ch. Aug. 27, 2015) (explaining that part of the court's pretrial "conclusion that triable issues of fact existed regarding the Committee's independence" existed was based on the controller's response to the outside directors' decision opposing a controller-proposed transaction where the controller "did everything he could to pressure both of them into changing their views," including leaving "a threatening [voicemail] message" with one director, demanding the resignation of another director, and nullifying certain actions taken by the board).

[18] *See In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *35 (Del. Ch. May 3, 2004, revised June 4, 2004) (finding committee uninformed where controller withheld material financial projections); *Kahn v. Tremont Corp.* (*Tremont I*), 1996 WL 145452, at *15 (Del. Ch. Mar. 21, 1996) ("Generally in order to make a special committee structure work it is necessary that a controlling shareholder disclose fully al the material facts and circumstances surrounding the transaction." (internal quotation marks omitted)), *rev'd on other grounds, Tremont II*, 694 A.2d at 422; *see also Elgamal*, 2014 WL 957550, at *29 (finding material dispute of fact on application for summary judgment over whether committee was effective when it failed to stay informed "about the fair value of the corporation and the minority stock" or about the "material developments in the negotiations"); *Loral*, 2008 WL 4293781, at *8 (finding committee uninformed where none of its members "had any particular expertise or experience in the [relevant] industry"); *Tele-Commc'ns*, 2005 WL 3642727, at *10 (finding material dispute of fact on application for summary judgment over whether committee was effective where it "lacked complete information with respect to both the premium at which the [one of the company's tracking stock] shares historically traded, and precedent transactions involving high-vote stock premiums").

which, in the aggregate, raises doubts.[19] Or a committee may proceed in a manner that calls

into question whether it has acted independently and negotiated at arms' length.[20]

Morgan's service on each of the special committees provides cause for concern.

Morgan was enmeshed in the web of business and personal relationships that characterizes

[19] *See Tremont II*, 694 A.2d at 426–27, 430 (questioning committee's effectiveness where one member was a lawyer "affiliated with the law firm which represented [the controller] on several of his corporate takeovers" and relied on the controller for "a consulting position" after his own business "had all but dried up," another member was employed by one of the controller's companies in connection with a proxy contest, the third member was named to the controller's "slate of directors in connection with the . . . proxy contest," the committee's financial advisor earned "significant fee income from [controller] related companies," and the committee's legal advisor "had previously represented a Special Committee of [one of the controller's companies] in connection with a proposed merger" as well as the "underwriter in connection with a proposed convertible debt offering by [one of the controller's companies]"); *S. Peru*, 52 A.3d at 790 (explaining that in *Tremont II* the high court "found problematic the supposedly outside directors' previous business relationships with the controlling stockholder that resulted in significant financial compensation or influential board positions and their selection of advisors who were in some capacity affiliated with the controlling stockholder" (footnote omitted)); *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 54–55 (Del. Ch. 2013) (finding member of committee exhibited "a sense of 'owingness' that compromised his independence for purposes of determining the applicable standard of review" where member "had a long history with" the controller," the member had served previously as President and COO of another of the controller's portfolio companies, the member was asked "to work with [the controller] on other companies," the member "invest[ed] about $300,000 in three [controller] funds," the member was concurrently the CEO at another company "backed by [the controller]," and the controller designated the member to the company's board of directors).

[20] *See S. Peru*, 52 A.3d at 798 (explaining that the committee fell "victim to a controlled mindset"); *Loral*, 2008 WL 4293781, at *9 (finding committee ineffective where it "allowed itself to go down the most dangerous path for anyone dealing with a controlling stockholder[—]that of believing that its only option was to do a deal with the controller"); *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1179 (Del. Ch. 1999) (finding committee ineffective where there were no "extraordinary negotiations" and committee falsely believed that proposed transaction was "the only viable alternative [to] a bankruptcy" (internal quotation marks omitted)), *aff'd*, 766 A.2d 437 (Del. 2000).

Silicon Valley. Oak Hill was a major player in the Silicon Valley ecosystem. Morgan had longstanding personal connections with Pade as well as close ties to Oak Hill and its outside counsel, Wilson Sonsini. As a "Startup Sherpa" who regularly shepherded emerging companies through the fundraising process, Morgan had ample reason to remain on good terms with Oak Hill, a $10.4 billion private equity firm that was active in the technology space. Morgan was one of just two members on the special committee, and he chaired the First and Third Committee.

The interactions between the special committees and Oak Hill, and especially between Morgan and Pade, provide additional cause for concern. In May 2012, months before the First Committee was formed, Pade and Morse reported to Oak Hill that they had discussed the Redemption Right with Morgan and Jarus, who "recognize[d] the legal rights of the preferred." JX 1191 at 12. During the First Committee's negotiations, Morgan and Pade engaged in back-channel communications. *See* JX 1378; JX 1392; JX 1411. Morgan even asked Pade for a favor fifty minutes before the first negotiation session with Oak Hill. *See* JX 1387.

The special committees' reliance on conflicted management was a significant defect. The committees relied on Domeyer, Murray, and Greene to develop redemption proposals, yet all three executives had bonus agreements that incentivized them to maximize the amount of proceeds that Oak Hill would receive. During the Third Committee's work, management negotiated a total bonus amount with Oak Hill based on the sale of Domain Monetization and what the "remaining liquidation" of the Company might yield. *See* JX 1878 at 1; JX 1884 at 1; JX 1915 at 1. Also during the Third

76

Committee's work, Pade discussed post-Oversee employment opportunities with both Murray and Greene, and he found Murray a job at another Oak Hill portfolio company. He even had Oversee provide Murray with a more generous severance package to make taking the Monsoon job sufficiently attractive to her. JX 1865.

Equally troubling was the extent to which the senior managers interacted with and took direction from Oak Hill on matters affecting the special committees' work. On August 1, 2012, weeks before the First Committee was formed, Murray and Domeyer met with the Oak Hill deal team and targeted a redemption of $80 million. *See* JX 1219; JX 1248 at 13. Management continued to work closely with Oak Hill throughout all three committee processes. *See*, *supra*, Parts I.K, M, & O. Murray was especially beholden to Oak Hill. She updated Pade, Morse, and Scott regularly about the committee and its activities, and she consistently reviewed materials with Scott and others at Oak Hill before providing them to the committee. *See* Murray Tr. 1029–31, 1046-54, 1069-71; Domeyer Tr. 1379–80; Greene Tr. 1935; JX 1089; JX 1458; JX 1948; *compare* JX 1278 at 2 *with* JX 2518 at 1, *and* JX 1287 at 3 *with* JX 2519 at 1, 2.

Perhaps as a result of these connections, the special committees seemed less intent on negotiating with Oak Hill and more interested in achieving the result that Oak Hill wanted, with lots of process and a few victories on small points along the way to create good optics for the litigation record. The overall pattern of the committees' tended too much towards facilitation.

To cite these concerns is not to intimate that the special committees were a sham, nor to suggest that Morgan and Jarus acted in bad faith. In each of the committee's

77

iterations, Morgan, Jarus, and their advisors took their jobs seriously, and they did many things well. Ultimately, a combination of factors raises sufficient doubts about the effectiveness of the committees to prevent them from having burden-shifting effect.

## C.      Entire Fairness

"The concept of fairness has two basic aspects: fair dealing and fair price." *Weinberger*, 457 A.2d at 711. Although the two aspects may be examined separately, they are not separate elements of a two-part test. "[T]he test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness." *Id.*

### 1.      The Fairness Of The Process

The fair process dimension of the entire fairness inquiry examines the procedural fairness of the decision, transaction, or result being challenged. It considers the manner in which the challenged decision, transaction, or result came about. The defendants fell short on this dimension of the analysis.

The fair process inquiry examines how the decision under challenge was initiated. This includes examining the source of the idea and who was the driving force behind it. *See, e.g.*, *Dole*, 2015 WL 5052214, at \*26; *Trados II*, 73 A.3d at 56. In this case, Oak Hill initiated the cash-accumulation strategy. Oak Hill relieved Kupietzky of his duties and told the Operating Committee to make deep cuts. After the business stabilized, Oak Hill pushed management to make further cuts and maintain the Company's margins. Oak Hill also used bonus agreements to align management's incentives with Oak Hill's.

Fair dealing also examines how the challenged events unfolded, typically by exploring how a transaction was negotiated and structured. *See Weinberger*, 457 A.2d at 711; *Trados II*, 73 A.3d at 58. Oak Hill drove the cash accumulation strategy. It is undisputed that Oak Hill had bi-weekly calls with the CEO, communicated regularly with management, met informally with management, and exchanged thousands of emails with the senior management team. *See* Dkt. 558 at 56. Management reviewed monthly board presentations with Oak Hill before distributing them to the full Board. Management also reviewed the Company's annual business plans with Oak Hill and obtained Oak Hill's approval before circulating them to the full Board. Oak Hill controlled the Company and made sure that management knew where Oak Hill wanted to end up.

Fair dealing also considers how director approval is obtained. *See Weinberger*, 457 A.2d at 711; *Trados II*, 73 A.3d at 58. None of the outside directors could recall a discussion about how to spend the Company's cash balance between mid-2011 and the First Redemption. *See* Morgan Tr. 1637–39; Jarus Tr. 1824; Ng Tr. 696. Morgan and Jarus could not recall any discussions after the sale of the Domain Monetization business about whether the cash should be reinvested in the Company's Vertical Markets business. Morgan Tr. 1698–99; Jarus Tr. 1848–49.

The traditional indicators of fair dealing were thus lacking in this case, but that is largely because the plaintiff attacked the decision to accumulate cash. The plaintiff did not directly challenge the Board's decisions to redeem Oak Hill's shares, and the plaintiff abandoned its challenges to the transaction prices that the Company obtained for its

79

businesses. Had the plaintiff challenged those decisions, then the analysis of the fair process dimension would have unfolded differently.

### 2. The Fairness Of The Price

The fair price dimension of the entire fairness inquiry examines the substantive fairness of the decision, transaction, or result being challenged. In the traditional formulation, it "relates to the economic and financial considerations" of the transaction under challenge, "including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Weinberger*, 457 A.2d at 711. The defendants proved that the cash accumulation strategy was substantively fair.

### a. The Root Cause Of Oversee's Decline

The basic inquiry for fair price is whether "the common stockholders received in the [transaction] the substantial equivalent in value of what they had before." *Trados II*, 73 A.3d at 78. Here, Oversee's common stock would have ended up worthless with or without the cash-accumulation strategy.

The defendants proved that the root cause of Oversee's decline was not self-interested conduct by Oak Hill, but rather intense industry headwinds and competitive pressures that began almost immediately after Oak Hill's first investment in 2008. The weight of the evidence demonstrates that there was no acquisition or growth opportunity that the Company's former executives and directors could have pursued that would have changed the outcome. *See* Domeyer Tr. 1356; Pade Tr. 441–42, Morse Tr. 1203–04; Scott

Tr. 843–45. Had the Company invested the cash instead of using it to redeem the Preferred Stock, then it is more likely than not that the value would have been destroyed.

Obviously this analysis involves envisioning a counterfactual scenario, and it is impossible to know with certainty what would have happened. The standard of proof, however, is a preponderance of the evidence, and the defendants proved by a preponderance of the evidence that the common stockholders would not have benefited if the Company had invested its cash in what were seen at the time as growth projects.

### 1. The Factual Record

Kupietzky testified convincingly that the Domain Monetization business, which was the cornerstone of Oversee's success, peaked in 2007. Kupietzky Tr. 17. The next year witnessed the start of Google's relentless and ultimately successful campaign to dominate search and end direct navigation, resulting in the search function being incorporated into the URL bar. *Id.* at 29–30 Google also began its successful effort to eliminate the Company's priority access to its search feed and began renegotiating the Company's revenue-sharing agreement steadily downward. The arrival of 2008 also saw the organization that oversaw domain registrations put an end to the Company's ability to try out a URL before buying it, which reduced the Company's profitability. Two years later, in 2010, Google began a steady series of refinements to its search algorithm that were designed to favor high-quality domain names and reduce the traffic to parked domains, like the ones the Company owned and operated. With the benefit of hindsight, it is clear that the Domain Monetization was doomed, an Internet-age counterpart to the buggy-whip makers and video-rental stores of earlier eras. What is impressive, again with the benefit

of hindsight, is how Oversee was able to continue to make money from this declining business and eventually sell it for $40 million in 2014. That arms' length price was fair, and no one argues otherwise.

The critical question for Oversee, therefore, was how to use the cash that its Domain Monetization business generated. The plaintiff contends that the answer to this question is obvious: use the cash to invest heavily in Vertical Markets and achieve long-term growth. For common stockholders, who in retrospect lost the entire value of their investment, the decision understandably seems easy. But the evidence demonstrates that choosing among the available options was quite hard.

Investing in Vertical Markets was far from a sure thing. The Company had enjoyed some success with its early sites, but they had tended to be "easy up, easy down." Kupietzky Tr. 25. The Company built a mortgage-lead-generation site that grew to several million dollars in revenue, but after the financial crisis of 2008, it quickly fell to zero and was shut down. *Id.* The Company had a similar experience with its site for ringtones. *Id.* The Company's other efforts to establish verticals organically had not been successful. Oak Hill's deal team observed in January 2011 that "Oversee has sourced lead generation acquisitions at reasonable multiples and then grown them post-acquisition by using Oversee's insights into monetization trends. It has not been successful at organically creating these verticals." JX 642 at 10.

Shortly after the Oak Hill deal team made this statement, the Company had an object lesson about the risks of acquisitions. The Company had made a big bet on a retail vertical by paying $17 million to purchase Shopwiki.com. In early 2011, Google cut its traffic by

almost 50% with its initial Panda update. *See* Kupietzky Tr. 145–47; Morrow Tr. 168–69. Although the ShopWiki team was able to respond to Panda by restructuring and improving the website, ShopWiki could not compete with the combined onslaught of Google Shopping and Amazon.com. After Oak Hill removed Kupietzky in June 2011, Morrow explained in detail how the Vertical Markets businesses were vulnerable to Google. *See* JX 902. Although Morrow supported investing in Vertical Markets and attempting to grow that business, he also believed that Oversee's existing Vertical Markets businesses were low-value sites that had to buy traffic from Google and could not provide the foundation for meaningful expansion. *See* Morrow Tr. 161–62, 191–92.

During the second half of 2011, when the plaintiff contends that Oversee should have been continuing to invest rather than cutting expenses, the available opportunities were "damaged goods." JX 942 at 1. Kupietzky believed that it was "pretty impossible" in 2011 "to find a business that didn't have some dependency on Google, whether that was because you had to buy traffic from them or you needed them to monetize or you got your traffic for free through their search engine optimization." Kupietzky Tr. 148; *see id.* at 151–52. Morrow did not believe that the existing Vertical Markets platform could support a viable M&A program. *See* Morrow Tr. 184, 196. Another reality of the Vertical Markets business was that Google could launch a direct competitor and dominate the space by giving its own site priority placement on the search results page. *Id.* at 192–93. Investing in Vertical Markets, whether organically or by acquisition, thus carried the inherent risk that Google could wipe out its value overnight. *Id.* at 195, 220.

By the end of 2011, the Company's businesses had stabilized. By the end of January 2012, the Company had $38 million in cash on its balance sheet, and management projected finishing the year with $55 million in cash. JX 1111 at 3. There does not seem to have been as much effort to look for acquisitions in 2012 as there was in earlier years or during mid-2013. There is also documentary evidence suggesting that the Company could have invested more in the Vertical Markets business. *See, e.g.*, JX 1222 at 1; JX 1279 at 1; JX 1469 at 1; JX 1548 at 4; JX 1684 at 1; JX 2356 at 2; JX 2533 at 68; JX 2539 at 4-7. Intuitively, it seems like the Company should have been able to do something more productive with its cash than having it build up on the balance sheet.

By a preponderance of the evidence, the defendants overcame these doubts. Scott testified credibly that he did not think that "results would have been better if we made better bets," nor did he believe there was "a 'one that got away.'" Scott Tr. 844–45; *see id.* at 783–86, 791. As discussed below, Oak Hill's ownership of a majority of the common stock gave it an incentive to continue to try to create value at the Company rather than simply extracting the liquidation value of the Preferred Stock. *See* JX 1191 at 2; Scott Tr. 776–77, 782–83. Because Google soon entered and dominated each of the lines of business where Vertical Markets operated, it is likely that any additional investment in these businesses would have been lost. *See, e.g.*, Scott Tr. 826 (discussing fate of Nextag).

Ironically, Hsu personally experienced the same market pressures that doomed Oversee. After leaving the Company, he invested in a domain monetization company called Black Forest Data and a vertical markets business called King Street. Hsu Dep. 705–08;

84

750–51. Both failed, even though King Street's CEO tried many of the same strategies as Oversee. *See* JX 1756.

## 2. The Expert Testimony

The defendants presented expert testimony from Kelly Conlin. For almost a decade, he served as CEO of NameMedia, a close competitor of Oversee, and he gained deep insight into the monetization and vertical markets industries. Conlin Tr. 2511–12, 2530–31. Under his direction, NameMedia tried the strategy that the plaintiff contends that the defendants should have pursued: an acquisition-fueled attempt to pivot from monetizing parked domains to providing content. It did not work, and NameMedia ultimately stopped pursuing acquisitions and divested its vertical markets businesses. Conlin Tr. 2525–26.

The plaintiff's expert, Professor Kinshuk Jerath, effectively agreed that domain monetization was not a viable platform for growth. He opined that by 2011, the domain monetization industry was declining by 15–20% annually, "moving out as a business," and "going down." Jerath Tr. 2491, 2476–77.

Conlin explained that pursuing acquisitions had been a viable strategy for a company like Oversee during the period before the Great Recession, but that by 2011–12, "the bloom was off the rose" as "the domain monetization industry started going through its death by a thousand cuts of Google." Conlin Tr. 2525–26. He pointed to Internet Brands, which had grown almost exclusively by acquisition; it made only one acquisition in 2012 and none in 2013. Conlin Tr. 2593–94. He pointed out that Demand Media, which the plaintiff identified as Oversee's closest comparable, also attempted an acquisition-based

85

strategy of pivoting away from monetization. Between 2011 and 2018, Demand Media lost over 90% of its value. Conlin Tr. 2534–36; JX 2325 at 24–27.

Jerath, the plaintiff's expert, attempted to show that an acquisition strategy remained viable by presenting a list of acquisitions that other Internet companies completed between 2010 and 2018. Only three occurred in 2012, the critical year for the plaintiff's theory. JX 2566 at 52–54. Conlin explained credibly that none of the three—Ziff Davis Enterprises, Pooxi.com, and Forum Runner—was a valuable property. Conlin Tr. 2527–29. The record contains no evidence that Oversee missed an accretive opportunity.

Conlin also explained that the "pivot" strategy of using monetization traffic to support vertical markets business was a "fallacy." Conlin Tr. 2523–25; 2529–30. Many domain monetization companies tried it; none succeeded in doing it. Conlin reviewed a 2007 industry analyst report that identified twenty monetization services companies; he explained that the vast majority went out of business or transformed themselves into different types of companies. Conlin Tr. 2519–23. Conlin also reviewed a 2009 survey in *Domain Name Wire* of "companies that were best using domain parking technology"; none exist today. JX 2325 at 17.

Without any ability to use Oversee's domain monetization traffic to support its Vertical Markets websites, Oversee lacked any competitive advantage in building or operating Vertical Markets businesses. Moreover, its existing businesses were early-stage, low-value ventures. Jerath, the plaintiff's expert, described them as nascent, like startups. He further testified that overall, the success rate for new initiatives like Oversee's Vertical

86

Markets sites was just 5–10%. Jerath Tr. 2485–87, 2503. Put differently, money invested in these sites would have had a 90–95% chance of being lost.

The data prepared by the plaintiff's damages expert, David Clarke, also indicated that Oversee would have destroyed value by reinvesting its cash. Clarke prepared an index of comparable publicly traded companies and tracked their performance. Starting in mid-2011, when the plaintiff contends that Oversee should have been investing its cash, Clarke's index lost money, and it continued to decline in value through May 2017. *See* DDX 8.21. When confronted with his own data, Clarke agreed that it would have been value maximizing to hold cash rather than investing in his set of comparables until after the complaint was filed in 2016. Clarke Tr. 2715–16. Four years before the index turned positive, in February 2013, Oak Hill could have exercised its Redemption Right, and nine months later, in December 2013, Oak Hill could have sold the Company using its Drag-Right.

The companies in Clarke's index that survived and eventually generated positive results did so by transforming themselves into entirely different types of businesses. Between June 2011 and April 2019, Blucora was the runaway winner among Clarke's set of comparable companies, growing its market capitalization by some 400% and driving 60.2% of Clarke's index. JX 2589 at 2, 26. Blucora did not remain a vertical markets company. In March 2016, it underwent a "strategic transformation," divested the businesses that were comparable to Oversee's, and became "[a] Wealth Management business and an online Tax Preparation business." Clarke Tr. 2725–28; *see* JX 2495 at 55–

87

58. The other companies in Clarke's index either disappeared, lost value (TravelZoo, Marchex), or remained relatively flat (QuinStreet). DDX 6.2.

The companies that other sources in the record deemed comparable to Oversee followed a similar arc.

- Cronkite & Kissell used a set of comparables that became dominated by Blucora and Tucows, a company that by 2016 derived 98–99% of its revenues from businesses in which Oversee never operated. DDX 6.6; Clarke Tr. 2732–33; Jerath Tr. 2504.

- Jefferies used a set of comparables that became dominated by IAC, a conglomerate ten times the size of Oversee (at its height), whose businesses include dating site Match.com, apparel retailers, and the news website the Daily Beast. DDX 6.9; Clarke Tr. 2733–38; JX 1153 at 27.

- Oak Hill used a set of comparables that became dominated by LendingTree, a mortgage company. DDX 6.8; Clarke Tr. 2739–41; JX 2489 at 4.

For Oversee to succeed by reinvesting its cash would have required a speculative move into a new line of business. Based on the expert testimony, it is more likely than not that this effort would have failed.

### b. The Counterfactual Analysis

Defendants' damages expert, Professor David Smith, prepared a counterfactual analysis that tested whether Oversee could have created value for the common stock if it had invested its cash in its business rather than using it for redemptions. Smith's analysis showed that investing in Oversee's business would not have generated value for the common stock.

Smith conducted his analysis by assuming that (i) the Company reinvested all of its cash flow immediately, (ii) the Company did not make any redemptions or pay any

bonuses, and (iii) Oak Hill sold the Company using its Drag-Along Right on December 31, 2013. He started with the highest contemporaneous value of Oversee's non-cash assets as of December 31, 2013, which was $52.7 million. He subtracted that from the Preferred Stock's liquidation preference of $150 million, which was the hurdle that the Company would have to clear for value to accrue to the common stockholders. This left a difference of $97.3 million.

Smith calculated that Oversee's cash flows would have had to generate an annual return of 83% between June 30, 2011 to December 31, 2013, to bridge the $97.3 million gap. He then compared this required rate of return to the returns that comparable companies generated using the index that Clarke prepared and other indices in the record, treating them as proxies for the results that Oversee could have obtained by investing its cash. None of the comparable indices generated anywhere close to the required 83% return. The returns for vertical markets businesses ranged from just 4% to negative 31%.

Based on his analysis, Smith opined that the common stockholders could not have been harmed by Oversee's failure to invest its cash. Regardless of the defendants' actions, the common stockholders would have received the same value: nothing. His analysis also did not change if Oversee had more time. Smith Tr. 2800–01. Using Clarke's index, any dollar invested on the breach date would have lost almost half its value (-44.95%) by the filing of the Complaint in 2016. JX 2583 at 16.

### c. The Fairness Of The Asset Sales

A third factor supporting the financial fairness of the defendants' course of conduct is that they obtained full value when selling the Company's assets. For purposes of the

89

*Pleading-Stage Decision*, the complaint's allegations supported an inference that the defendants had engaged in hasty sales and sold assets at less than fair value to create proceeds that could be used for redemption. The factual record at trial did not support that assertion. There was no showing of any deficiency in the process, timing, or price of any divestiture. The plaintiff correctly points out that businesses were sold for less than their purchase price and below earlier estimates of their value, but that was not because of any pressure to raise cash. It was because of the declining value of the businesses in the face of industry competition.

The Company accumulated cash, but the defendants did not sacrifice value when selling assets. The price in an arms' length transaction is typically the best indicator of the value of that business. The fact that the Company sold its assets for full value undermines the contention that the Company could have created greater value by retaining its businesses and investing in them.

### d. Oak Hill's Incentives

Oak Hill's economic incentives are a final contextual factor that supports the economic fairness of the cash-accumulation strategy. Although Oak Hill wanted a return of capital and had an incentive to enhance the value of its Redemption Right, Oak Hill also owned a majority of the Company's common stock. Oak Hill's large position in the common stock meant that Oak Hill had a counterbalancing incentive not to harm the value of the common stock. Indeed, because Oak Hill wanted a return on its investment, Oak Hill had an incentive to enhance the value of the common stock.

In 2011, when the plaintiff claims that Oak Hill began to enhance the value of its Redemption Right at the expense of the common stock, Oak Hill valued the Company at $215 million. *See* JX 907; Scott Tr. 736–39. At that valuation, Oak Hill believed that its Preferred Stock was worth its full liquidation preference of $150 million, and Oak Hill regarded its common stock as having an additional value of approximately $34 million. Unless Oak Hill had some pressing need for cash, it would not have been rational for Oak Hill to sacrifice the overall value of its investment to achieve a near-term return of capital. Oak Hill did not face any financial pressure. Oak Hill also could not reinvest the money it returned from Oversee towards some higher use; it could only return it at a loss to Fund III's investors. *See* JX 599 at 1; Scott Tr. 789–91.

The plaintiff proved that one reason that Oak Hill wanted its portfolio companies to generate liquidity in 2011, 2012, and 2013 was to improve Fund III's level of distributions to paid-in capital. To look good for Fund III's limited partners, and to attract investors when raising Fund IV, Oak Hill wanted to be able to show that it had achieved a DPI of 0.30x. That was an interest unique to Oak Hill, and it played a role in Oak Hill's actions, but it was not sufficiently pressing to overcome Oak Hill's financial interest in trying to make the investment in Oversee a success.

The Oak Hill deal team did not behave like people who were happy to build up a cash balance, redeem part of their Preferred Stock, and then write off the rest of Oak Hill's investment. Pade, Morse, Scott, and their colleagues spent countless hours working with the Company to enhance the value of Oak Hill's investment. *See* Dkt. 558 at 56, 72. On the one hand, those interactions illustrate Oak Hill's control over the Company. On the

other hand, they show that Oak Hill wanted *both* a return of capital *and* to make the Company a success.

Oak Hill's contemporaneous documents show that even as the firm sought to achieve a return of capital, it remained focused on growth. In March 2011, the Oak Hill deal team described the Preferred Stock as "money good" and observed that "[t]he near-term upside to our investment is in the common stock acquired from the founders in 2009." JX 723 at 13. In May 2012, the Oak Hill deal team explained that they were seeking

> to focus on the best growth opportunities and to divest non-growth assets in the ordinary course only if the proceeds to the Company are in excess of what the board believes the value to holding the assets are (i.e., we are not simply selling assets in order to increase cash for redemption).

JX 1191 at 12. The presentation emphasized that because of Oak Hill's ownership of the common stock, the firm was "not incented to truncate [the] value to the common stock simply in order to accelerate repayment on the preferred." *Id.* Instead, Oak Hill's common stock "was in a very levered position," meaning that the returns on the common stock were sensitive to any fluctuation in enterprise value. Scott Tr. 776–77. For Oak Hill, therefore, the greatest upside came from increasing the value of its common stock. *See* JX 1191 at 14. The Oak Hill deal team also wanted to show a return on the common stock to demonstrate that Oak Hill had not "throw[n] good money after bad" by making a second investment in the Company in 2009. Morse Tr. 1129. The Oak Hill deal team had been telling their partners and Fund III's investors that they would make money on the common stock, and they wanted to achieve that goal. *See* Scott Tr. 796.

92

In its internal valuations, Oak Hill did not treat the redemptions as affecting the value of Oak Hill's common shares. *See* JX 1573A; JX 2482; Scott Tr. 754. As late as June 30, 2013, Oak Hill's internal forecasts projected that the common stock would increase in value and generate a return for Oak Hill. *See* JX 2482 at 3; Scott Tr. 754–55.

Finally, the Drag-Along Right gave Oak Hill an incentive to support accretive investments at Oversee, because Oak Hill could realize the value of those investments by selling the Company in a stockholder-level transaction. *See* Morse Tr. 1141–42. The Preferred Stock would take the first $150 million, and Oak Hill would realize upside through its ownership of common stock. Oak Hill could exercise the Drag-Along Right if the Company failed to redeem at least half of the Preferred Stock by December 2013. Oak Hill thus did not face a situation, as in *ThoughtWorks*, where a board of directors could reinvest the Company's cash flow in the business and only determine that a relatively small amount was available for redemptions. If Oversee's directors had somehow tried that strategy, Oak Hill could have exercised the Drag-Along Right to realize the full value of its investment. Morse Tr. 1141–42; Scott Tr. 879–84.

### 3. The Unitary Determination of Fairness

"The concept of fairness is of course not a technical concept. No litmus paper can be found or [G]eiger-counter invented that will make determinations of fairness . . . ." *Tremont I*, 1996 WL 145452, at *15. "This judgment concerning 'fairness' will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1140 (Del. Ch. 1994) (Allen, C.), *aff'd*, 663 A2d 1156 (Del. 1995). The economic dimension of the

analysis can be "the predominant consideration in the unitary entire fairness inquiry." *Dole*, 2015 WL 5052214, at *34.

The defendants proved that it was not a fiduciary wrong to accumulate cash so it would be available to redeem the Preferred Stock when Oak Hill exercised the Redemption Right. With the benefit of hindsight, the defendants proved that this was the best use of the Company's cash. It is more likely than not that other alternatives would have been value destroying. It is highly unlikely that any other uses could have generated enough value to exceed the Preferred Stock's liquidation preference. The strategy thus inflicted no harm on the common stockholders, who are in at least as good a position now as they would have been if the Company had followed a different course.[21] In other words, the defendants' actions were entirely fair.

## D. Other Issues

The parties have raised a number of other issues, including (i) whether any individual defendant could be held personally liable in light of the exculpation clause in

---

[21] Because this lawsuit is framed as a derivative action, the question technically is whether the strategy was fair to the Company. However, as discussed in the *Pleading-Stage Decision*, Delaware law contemplates that fiduciaries will manage the corporation for the benefit of the holders of its undifferentiated equity, which generally means the holders of common stock. 2017 WL 1437308, at *22. The plaintiff recognizes that this case is really about the common stock and requested a stockholder-level remedy. From a theoretical standpoint, Oak Hill's cash accumulation strategy might have harmed Oak Hill derivatively as the sole owner of the Preferred Stock, but it would be illogical to hold that the strategy was unfair to the Company on that basis. Oak Hill is not pursuing any claims or seeking any remedy. Oak Hill accepts that it suffered a loss on its investment. Perhaps in some other case there might be different holders of preferred stock who could claim derivative harm in a similar situation such that they would benefit from a derivative remedy, but not here.

94

the Company's certificate of incorporation, (ii) whether the plaintiff proved any damages to the Company, (iii) whether the plaintiff proved that any damages to the Company were proximately caused by the defendants' actions, (iv) whether the plaintiff could obtain a stockholder-level remedy, (v) whether a stockholder-level remedy could include a damages award for option holders, and (vi) whether the plaintiff's claims are barred by laches. Because this decision has found that the defendants' actions were entirely fair, there was no fiduciary breach, and there is no need to reach any of these additional issues. The court intimates no opinion regarding them.

## III.    CONCLUSION

The defendants proved that their conduct was entirely fair. Judgment will be entered in their favor on the plaintiff's claims. The parties shall confer and identify any additional issues that need to be resolved to bring this matter to a conclusion at the trial level.